[No. S057321. July 1, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
DARREL LEE LOMAX, Defendant and Appellant.

532

534

536

COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jay Colangelo and Jessica K. McGuire, Assistant State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C.

Hamanaka, Assistant Attorney General, Keith H. Borjon, Joseph P. Lee and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORRIGAN, J.**—A jury convicted defendant of two robberies, with a murder in the course of the second.[1] It found he had used a firearm in all the offenses and found true a robbery-murder special circumstance.[2] Because the jury set the penalty at death, this appeal is automatic. We affirm.

## BACKGROUND

I. *Guilt Phase*

A. *Robbery of James Edge*

Around 1:30 a.m. on August 25, 1994, James Edge closed his laundromat in Long Beach and walked to his car. A couple drove into the parking lot, and the man asked if the laundromat was open. Edge said it would be at 6:00 a.m. As Edge got in his car, the man pushed a large black automatic handgun into Edge's ribs. The man said, "Give me all your money. Give me everything you got." Edge complied, handing over approximately $200 in cash and other items. As the couple drove off in a green Ford, Edge noted the license plate number, which he reported to the police.

Shortly after the incident, Edge selected defendant's photograph from a photo lineup, saying he "looked like" the robber. He told the police he got a good look at the man and could recognize him if he saw him in person. Several months later, Edge identified defendant at a live lineup. At trial, Edge said he was "certain" defendant was the man who robbed him.

B. *Robbery and Murder of Nasser Akbar*

Angela Toler, an accomplice in the robbery-murder case, testified against defendant. She told the jury that on August 29, 1994, she went to the apartment of her friend and neighbor Ihesia Sullivan. Sullivan was there with defendant, whom Toler knew as Malik Hasan. In the afternoon, defendant asked Toler to "hook him up with a lick," which meant to show him a place he could rob.

---

[1] Penal Code sections 211 and 187, subdivision (a).

[2] Penal Code sections 12022.5, subdivision (a), and 190.2, subdivision (a)(17). All statutory references are to the Penal Code unless otherwise stated.

Around 10:30 or 11:00 p.m., Toler and defendant left in a rented Ford Taurus. Sullivan stayed home with her children. Toler had smoked phencyclidine (PCP) about six hours earlier. She testified that she was no longer under the influence of the drug when she and defendant looked for a place to rob.

Toler and defendant drove to a liquor store but left because it was too crowded. They drove next to the P & B Market on Fourth and Cherry Streets, parked around the corner, and walked into the store. Both were armed with semiautomatic handguns. Toler's was chrome plated and pink handled; defendant's was black. They entered the store and announced, "[this is] a robbery." Defendant stood across the counter from the clerk, Nasser Akbar. Akbar handed money to both defendant and Toler. When another employee emerged from the back of the store, Toler pointed her gun at him.

Akbar did not speak, reach for anything, or make any threatening gestures during this exchange. Nevertheless, after the money changed hands, defendant shot Akbar twice. As Akbar lay on the floor, defendant reached over the counter and shot him twice more. Defendant then shot the store's security camera. Toler testified that she did not fire her weapon during the incident. A total of $68 was stolen.

Private security guard Cleavon Knott had known Akbar for about two years. He came to the store regularly to give his friend security at closing time. Shortly after 11:00 p.m., Knott drove into the P & B Market parking lot and saw two people inside pointing semiautomatic handguns at Akbar. The man's gun was black, and the woman's was chrome. Akbar stood behind the counter, between two cash registers. Another clerk was farther back in the store. The woman picked up something from the counter, then "flinched." At the same moment, Knott heard gunfire and saw the man shoot Akbar. The robber fired three rapid shots and, after the clerk fell, reached over the counter and fired another shot toward the ground. Knott saw the shooter rise and fire one more shot toward the back of the store, but he could not tell if anything was hit. Knott testified he was "positive" defendant was the person who repeatedly shot Akbar.

The couple fled the store and came within 16 feet of Knott. Knott recognized Toler because she lived across the street from his sister and Knott had seen her around town. He also recognized defendant as someone he had seen earlier in the day sitting outside Sullivan's apartment. He had seen defendant several times in the week before the murder. The couple ran around the corner. Knott started to follow, but instead entered the store. Inside, he saw a clerk crouching down by the freezer and Akbar lying facedown in a pool of blood. Knott immediately went to him. Akbar looked up and said, "Help me, friend."

Long Beach Police Officer Ernest Armond was dispatched to the market. He entered to find Akbar lying behind the counter in a pool of blood. Akbar tried to talk, but Armond could not understand him. Paramedics were called, but Akbar expired before they arrived.

Armond and his partner examined the scene and spoke with witnesses. They saw a nine-millimeter shell casing, bullet fragments, and several broken liquor bottles near the security camera and on the floor near the blood pool. Crime scene investigators recovered four spent nine-millimeter shell casings from inside the store. No casings of any other caliber were found. Investigators also recovered two bullet fragments, one on the floor where the victim had fallen, and one on the countertop. No ballistic evidence was initially found near the security camera, which had apparently been hit by a bullet. Four or five days later, officers discovered a nine-millimeter shell casing in this area.

Security guard Knott reluctantly spoke to police at the scene. He did not see defendant and Toler get into a car, yet he told the officers the robbers had fled in a white Oldsmobile Cutlass. Later that night, police took Knott to a field showup of defendant and Toler. Knott recognized them as the robbers but did not identify them. Knott testified that he lied because he did not want to be involved. He wanted no problems with defendant and Toler, who lived nearby. Knott knew that Toler was a member of a local gang, the Insane Crips. He feared for his own safety and that of his sister and her children. The next day, Knott came forward and told the police what he had seen. While still afraid, he had decided to cooperate because he knew Akbar and because "it was the right thing to do." Knott did not ask for any assistance in exchange for his testimony, and the police offered none. However, several months later, the police helped Knott secure the dismissal of some outstanding traffic warrants. Knott asked for this help because he feared that, if arrested, he might encounter defendant in jail. Knott identified defendant in a live lineup.

After the shooting, Toler and defendant ran to their car and drove to Toler's house. Defendant went across the street to Sullivan's apartment. Toler joined them minutes later, after leaving her share of the robbery money at home. The three then left Sullivan's apartment and drove around "for no reason at all."

Shortly after midnight, the police pulled them over for making an illegal lane change. Toler was driving, with Sullivan in the front passenger seat and defendant in the back. As Officer Timothy Everts approached the car, he saw that defendant, a Black male with cornrow braids, matched the description of a robbery-murder suspect. Defendant's shoulders were moving and his hands

were between his legs. The officers ordered the suspects to stand outside and searched them. Defendant was carrying $43.57. When Officer Everts looked inside the empty car, he saw a gun lying inside the map holder directly in front of where defendant had been sitting. The handle protruded so that a person could have grabbed the gun with ease. Defendant and the two women were arrested.

The car was the same one driven by the couple who had robbed James Edge. The gun recovered from the backseat was a Glock nine-millimeter semiautomatic. The police also found a chrome Lorcin .25-caliber semiautomatic wedged into a space next to the driver's seat. The Lorcin's pink grip protruded slightly above the front seats. Both weapons were loaded. The Glock's magazine contained 11 rounds of ammunition with another round in the chamber. Fully loaded, the Glock could hold 18 rounds. The Lorcin had one round in its chamber and five in the magazine, all .25-caliber. Fully loaded, the Lorcin could hold eight rounds. Semiautomatic handguns such as the Lorcin and Glock expel a shell casing every time they are fired. All of the shell casings recovered from the P & B Market were nine-millimeter. No usable fingerprints were detected on the guns, however, and no gunshot residue was found on defendant's or Toler's hands.

Detective William Collette and Detective Logan Wren interviewed Toler at the police station. Although Toler admitted using PCP earlier in the day and showed some signs of recent use, she was lucid and appeared to understand the questioning. The officers concluded she was no longer under the influence of the drug. Toler initially denied involvement in the robbery but changed her story after the detectives said she had been identified as the woman in the store with a chrome handgun. The police made no threats or promises, and Toler asked for none. She confessed that she and defendant "had gone out to do a lick." She drove. They entered a store at Fourth and Cherry with their weapons drawn and told the clerk it was a robbery. After the clerk handed over the money, defendant shot the man and fired more shots at him as he lay on the floor. Toler saw another employee come from the back of the store. She pointed her gun at him but did not fire. Afterward, defendant gave Toler $36, her half of the stolen money.

Toler eventually pled guilty to robbery with the use of a firearm. In exchange for her agreement to testify against defendant, she was sentenced to 10 years in prison.

A firearms expert examined bullet fragments and shell casings from the market and the Glock pistol seized during the traffic stop. All the fragments had come from a Glock nine-millimeter, but their condition precluded a match to a specific gun. None of the fragments could have come from a

.25-caliber weapon. Shell casings found at the scene could be matched, however. Based on their unique markings, they matched the Glock pistol found during the traffic stop.

An autopsy revealed Akbar suffered four entry wounds to his torso and extremities. The two torso wounds were each fatal. Their upward trajectories were consistent with a standing shooter firing down at a prone victim. Two deformed bullet fragments and two intact bullets were removed from Akbar's body. The intact bullets were nine-millimeter caliber.

### C. *Defense Evidence*

Tena Delaguerra was near the corner of Fourth and Cherry when the market was robbed. She heard shots, then saw two Black people running from the store. Delaguerra could not discern their gender. She was too far away and was not wearing her glasses. Delaguerra thought the couple drove off in a dark blue or black vehicle. During this time, she also saw a Black man wearing a security guard shirt pull into the driveway of the store. Delaguerra thought "maybe" the driver pulled into the store's lot after she heard the gunshots, but she was "not really sure," because the events "happened so fast."

Deputy Probation Officer Leo Hurd interviewed Toler for a probation and sentencing report. Toler told him she used PCP, drank alcohol, and took the drug Dilantin for a grand mal seizure condition. She drank about a fifth of bourbon five days a week.

Terrence McGee, M.D., a specialist in addiction medicine, testified about the typical effects of marijuana, PCP, alcohol and nicotine. He considered a fifth of bourbon five times a week to be "extremely high" consumption. A person under the influence of alcohol has bloodshot, watery eyes, slurred speech, a flushed face, and altered gait and balance. A person under the influence of PCP often smells of ether and has a noticeably rigid walk; a blank stare; and nystagmus, an involuntary bouncing of the eyes. When seeing someone under the influence of PCP, an untrained person would recognize something was wrong. Only in very high doses, however, can PCP deprive users of the ability to perceive and understand their surroundings. In general, long-term users of PCP have a blunt, or flat, affect. The effects of PCP usually last from four to six hours, but the period can vary. Dr. McGee admitted he had never interviewed or examined Toler, nor had he reviewed the recorded portion of her interview with police detectives. He had no idea whether Toler accurately perceived and reported the events she testified about.

## II. *Penalty Phase*

### A. *Prosecution Evidence*

#### 1. *Other Crimes*

Defendant was convicted of trying to carjack Donna Annas at gunpoint outside a Portland, Oregon, restaurant in 1987. Security guard Dennis Bryant followed defendant as he left the crime scene. Bryant confronted defendant and said he would identify him to the police. Defendant replied, "You ain't got shit, motherfucker," and produced a handgun from under his shirt. He fired three shots at Bryant, who took refuge behind a telephone pole. One shot sailed past Bryant's ear, the second hit the pole, and the third struck a nearby building. Both Annas and Bryant attended defendant's sentencing hearing. Defendant apologized but explained he had been upset that night because it was his birthday and no one had given him a party. Defendant was received into the Oregon Department of Corrections on March 1, 1988, and released on parole on October 28, 1993.[3]

In April 1994, Brian Widmer went to buy marijuana at the Oregon home of his friends Brian Bachelor and Keith Jacobs. Widmer arrived with defendant and two other men Bachelor did not know. During the evening, defendant forced Widmer, Bachelor and Jacobs into the bathroom at gunpoint, while his two companions ransacked the house. After the three victims were bound hand and foot, defendant said to one of his associates, "Get a knife. I am going to kill these guys." About 15 seconds later, the bathroom light was turned off. Defendant said, "good night," and fired four shots into the bathroom. All three men were hit. One bullet entered Jacobs's head. It fractured his jaw, tore out his sinuses, and destroyed his right eye.[4]

#### 2. *Defendant's Behavior During Trial*

Deputy Sheriff Joseph McCaleb escorted defendant from a court hearing to a secure area. Defendant was wearing a waist chain, and his hands were cuffed. When they reached the holding cell, Deputy McCaleb opened the door and removed defendant's restraints. The deputy was armed with only pepper spray. Defendant refused to step into the cell, protesting that he had left some belongings in a different cell. McCaleb again told defendant to enter the cell, and he again refused. McCaleb explained that he did not have a key to the other cell but would get one and take defendant to retrieve his belongings. Defendant cursed at McCaleb, asking why he had not explained the problem

---

[3] Ten months later, he was still on parole when he committed the crimes involved here.

[4] After defense counsel refused to stipulate that Jacobs no longer had a right eye, the trial court permitted Jacobs to remove his eye patch and display the area to the jury.

before. Deputy McCaleb again directed defendant into the cell. This time he placed his hand on defendant's shoulder to guide him inside. Defendant spun around and punched the deputy in the head four to six times. Another deputy responded to McCaleb's call for help, and defendant was ultimately subdued. Deputy McCaleb suffered a concussion and was off work for three weeks.

During the penalty phase, after Donna Annas and Dennis Bryant testified about the 1987 crimes in Portland, defendant remained seated at counsel table when the jury was excused. After the jury and the judge had left the courtroom, defendant stood, turned to face a group of spectators, and displayed a sign he had written on a legal pad. It said, in large letters, "I will be out." Defendant then turned to Bryant and mouthed the word "mother-fucker," which Bryant understood as a threat. Officer Ernest Armond, who was in the courtroom waiting to testify, saw the sign and walked to the counsel table. Defendant tore the paper into small pieces. Officer Armond retrieved the pieces, which were shown to the jury.

### 3. *Victim Impact*

Officer Armond was introduced to Akbar in 1993 and considered him a good friend. Akbar was always kind, with a welcoming smile. When he arrived at the murder scene, Officer Armond found Akbar lying in a pool of blood, trying to speak. Armond stayed with Akbar until he stopped breathing. Armond suffered a personal loss in Akbar's death and still vividly recalled the events of that night.

Hilda Kelly operated an antiques store near the P & B Market. She visited the market often and had frequent conversations with Akbar. Akbar talked about his family and life in America. They discussed the increasing drug activity and panhandling in the neighborhood. Kelly described Akbar as "the loveliest person [she] had ever met." Always happy and even tempered, he often expressed pride in America and in his children's accomplishments. Akbar was helpful and concerned about others. Business owners in the area were shocked to learn of Akbar's death. Kelly closed her shop for a couple of days and became afraid to return to the area. She eventually moved her business to a new location.

Razieh Mardemomen and Akbar were married for 17 years and had two teenage daughters. The family moved to America from Iran in 1977. Akbar was a good husband and father and a hard worker. He "meant everything" to Mardemomen because she knew no one in this country. Life was more difficult emotionally and financially after Akbar's death because Mardemomen had to support the girls alone.

B. *Defense Evidence*

State prison inmate Roman Cooper saw the September 27, 1995 altercation between defendant and Deputy McCaleb. As they talked, McCaleb put his hand on defendant's shoulder. Defendant, who was not handcuffed, objected and grabbed the deputy's hand. Then, according to Cooper, "they started fighting," with both men throwing punches.

Defendant's stepfather, Alvin Carney, had known defendant since he was seven years old and helped raise him. They used to play sports together and had a warm relationship. Defendant was a "good kid," who was well behaved and never got into trouble. He was nice to others, especially small children. Defendant once had a job caring for youngsters. Defendant grew up in a "good home" and was never abused or mistreated. Carney could not envision defendant committing violence. He had never seen defendant curse or show disrespect to anyone. Carney did not believe in the death penalty. He thought defendant could do something productive with his life and help others, even from inside the penitentiary.

Defendant's uncle, Abdul Hasan, described defendant as a joyful, compassionate and fun-loving child. Hasan never saw defendant steal anything or act violently. Defendant grew up in a good home and was never abused or neglected. As a young man, defendant expressed a fear of government and society. He came to Hasan for religious guidance. Hasan, a practicing Muslim since the 1960's, counseled defendant to turn to God. Two or three years before the trial, defendant took the name Malik Hasan. His uncle did not believe defendant had committed any of the crimes of which he had been accused or convicted. All accusations and evidence against him were false.

Angela McCall met defendant in 1994, and they had a child together. Their relationship lasted about three or four months but they never lived together. McCall knew defendant had recently been released from jail but never learned what crimes he had committed. McCall never saw defendant use drugs or alcohol, possess a weapon, or commit a crime. He did not curse and was never abusive toward her or her children. McCall thought defendant should not be sentenced to death because he was "not a vicious person" and had a son to help raise.

Saundra Carney, defendant's mother, separated from his father while she was pregnant with defendant. She raised defendant and two older children alone until she married Alvin Carney. She did not work until defendant turned five and started attending school. Defendant was a slow learner at first. He sometimes got in trouble "like the other kids in the neighborhood" for childish behavior, but never for criminal activity. He got along well with

others, was mild mannered and respectful. When defendant was 12 or 13, he spent a year with his biological father. When he returned home, he seemed to have changed. Carney noticed he was staying out late and spending time with a different group of friends. However, Carney was shocked to learn of defendant's convictions. They were not consistent with his personality and the way he was raised. She thought defendant should not be executed because he was not a "bad person." She could not imagine defendant ever taking someone's life. At 25, defendant had been in jail for most of his adulthood. Carney thought defendant could live a productive life in prison by "help[ing] other people his age get their lives together."

## DISCUSSION

### I. Pretrial Issues

#### A. Speedy Trial

##### 1. Procedural Background

Defendant's first claim, that he was denied his constitutional and statutory speedy trial rights, requires a somewhat lengthy summary of the pretrial proceedings. On September 1, 1994, three days after Akbar's murder, the district attorney filed charges against defendant, Toler and Sullivan. The court appointed one attorney to represent all three defendants and continued the matter for a week. On September 8, 1994, the public defender declared a conflict as to Toler and Sullivan. Defendant asked to represent himself but refused to answer the court's questions. His request was denied and Deputy Public Defender Marvin Isaacson was appointed. Defendant refused to enter a plea, stating he pled "to no one but Allah." The court took this as a denial of guilt, and entered a plea of not guilty. Defendant's attorney asked for a motion date before the preliminary hearing because defendant was refusing to waive time. The matter was continued, with a preliminary hearing set for September 21, 1994.

At the next hearing, the court granted defendant's request to represent himself. Defendant told the court he was not ready to proceed with a preliminary hearing on September 21, and he waived time under section 859b.[5] At the next court date, defendant appeared in propria persona and agreed to a preliminary hearing date of September 28, 1994, but he observed, "it's going to take me a while to prepare." On September 28, defendant told

---

[5] Section 859b requires that a preliminary examination be held within 10 court days after a defendant's arraignment on a felony offense, unless this time limit is waived or good cause is shown for a continuance.

the court he needed a continuance to gather more information. The court appointed a defense investigator, and defendant agreed to a preliminary hearing date of October 26, 1994.

Defendant filed a discovery motion seeking names, addresses and telephone numbers of all witnesses. Although he had the relevant police reports, this information had been "blacked out." The prosecutor was willing to give unredacted copies of the reports to defendant's investigator, but he explained that the witness-identifying information could not be shared directly with defendant. The prosecutor also told defendant his investigator could obtain physical evidence, tape recordings and photographs from the police department. The court found that the district attorney's office was in substantial compliance with its discovery obligations.

On October 26, 1994, the prosecutor and defendant were ready to proceed with the preliminary hearing, but Toler's counsel requested a continuance. Finding good cause, the court continued the matter over defendant's objection. (See § 1050.1.) At a preliminary hearing held on November 18, 1994, defendant was held to answer. Toler testified against defendant at the hearing, identifying him as the shooter. On December 2, 1994, defendant asked the court to appoint "co-counsel." When the request was denied, defendant invoked his right to counsel. He asked the court not to reappoint Deputy Public Defender Isaacson because they did not "see eye to eye." Defendant said he wanted to represent himself "until something else [came] along." The court denied this request and appointed the public defender's office.

Once reappointed, Isaacson filed motions for a lineup and discovery. The prosecutor agreed to the lineup request and advised the court that "Mr. Isaacson is going to be sitting down with detectives and essentially getting everything [he's] asking for." The district attorney's office would also arrange for counsel to meet with one witness who did not want his address disclosed. However, the prosecutor had recently learned that "one of the witnesses may have returned to Cambodia."

On December 20, 1994, defendant moved to dismiss on the ground that he was denied a speedy preliminary hearing when the case was continued at Toler's request but over his objection. (§§ 859b, 995.) The motion was denied, and defendant sought writ review. The Court of Appeal issued an alternative writ of mandate, and the case was dismissed on March 13, 1995. A new complaint was filed the same day. After a second preliminary hearing, defendant was again held to answer.

At his arraignment on May 30, 1995, defendant successfully moved to represent himself. However, when the parties returned to court on June 5,

1995, defendant again requested counsel, and the court reappointed the public defender. At a trial-setting conference on June 21, 1995, Deputy Public Defender Isaacson told the court he was "obviously" not ready for trial. The defense had encountered problems in locating guilt phase witnesses and in investigating the penalty phase. The district attorney's office had not yet decided whether to seek the death penalty. The parties agreed to continue the matter to July 14, 1995, although defense counsel told the court he would not be ready to proceed on that date.

At the next hearing, defendant personally waived his speedy trial rights, and the parties agreed to continue the case until August 10, 1995. When the court expressed dismay that the case was not ready for trial, defense counsel said he had not been able to obtain addresses for some witnesses. The police refused to disclose the information to him without a court order. Counsel also reported that it was difficult to confer with his client, who was on high-security status at the jail. Defendant had "a lot of animosity" toward the public defender's office because of his security status, and defendant was "very reluctant to discuss his case." At the August 10 hearing, defendant again waived time and agreed to continue the case until August 28, 1995. Defense counsel noted that the prosecution still had not determined whether to seek the death penalty. He predicted the defense would not be ready for trial until "several months" after this decision was made.

On August 28, 1995, Deputy Public Defender Isaacson asked for the addresses of all witnesses, including penalty phase witnesses in Oregon. These addresses had been redacted from the police reports given to the defense. The prosecutor responded that the civilian witnesses were reluctant to be contacted because they were "terrified" of defendant. Isaacson explained that the defense had the names of the witnesses and most of their statements, and the private investigator initially appointed for defendant had also found some of the addresses. However, Cleavon Knott became upset when defendant's investigator contacted him, and the police refused to divulge any more addresses. Isaacson did not object to interviewing Knott at the district attorney's office, but he argued that other witnesses' addresses should be disclosed. In addition to information on the witnesses listed in his motion, defense counsel requested contact information for the market's owner, Somphop Mannil, so that Mannil could help him locate the other clerk working on the night of the robbery murder. The police believed the clerk had left the country. The prosecutor agreed to contact all the witnesses and turn over the phone numbers and addresses of all who consented to the disclosure. For any witness who objected, the prosecutor would arrange an in-person meeting between defense counsel and the witness. Except for the witness addresses, defense counsel noted that the police had been "very cooperative in showing

me all the physical evidence, showing me the clothes and going through records and documents that they have." Most of the discovery defendant sought had been provided.

Defendant interrupted this hearing with a *Marsden*[6] motion. When this motion was denied, defendant made his third request to represent himself. The court granted the request and appointed an investigator. Deputy Public Defender Isaacson reported that he had two boxes of discovery material in his possession, which he would deliver to defendant later in the week. The court ordered Isaacson to redact all witness addresses from the documents. Defendant agreed to this procedure.

At the next hearing, on September 27, 1995, defendant was given a letter from the district attorney's office indicating that a committee would meet on October 5, 1995, to decide whether to seek the death penalty. The committee wanted all mitigating evidence to be submitted for its consideration by October 3. Defendant complained that he had not yet received all the discovery from Deputy Public Defender Isaacson. Although Isaacson had come to the jail, he did not bring everything defendant wanted, and defendant left their meeting abruptly because it was mealtime. The court directed that discovery be provided to defendant. Defendant asked the court to appoint cocounsel or advisory counsel. The court denied this motion and defendant's request for $400 in telephone funds. Defendant protested that he was being "hindered," accused the court of bias, and asked for an attorney to be appointed again. The court reappointed the public defender's office over defendant's strenuous objection.

On October 4, 1995, Deputy Public Defender Isaacson told the court that the prosecutor had promised to disclose all of the missing witness addresses after he obtained them from the authorities in Portland, Oregon, but had not done so. Isaacson complained that his efforts to prepare for a penalty phase had been stalled by his inability to contact the Oregon witnesses. Expressing displeasure at the district attorney's delay in providing witness information, the court set a final discovery compliance date of November 6, 1995, and warned that sanctions would be imposed if compliance was not made, or excused, by that date. Defendant personally waived time until the November 6 hearing. The matter was continued twice more at defense counsel's request.

When the parties returned to court on November 30, 1995, the district attorney's office had decided to seek the death penalty. Defense counsel reported that he had received copies of police reports from the Oregon crimes along with all witness-identifying information. However, his investigator was

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

still having difficulty locating the witnesses. Counsel learned there had been further developments in the Oregon cases. He was trying to gather more information from attorneys representing the other suspects in these cases, but these attorneys were not cooperating. The prosecutor responded that he had turned over addresses for all witnesses except James Edge and Cleavon Knott. These two men, who had objected to the disclosure, would be available for interviews at the district attorney's office. The prosecution had also turned over all the information it had concerning the Oregon incidents. The prosecutor agreed to give the defense any new addresses or information his office discovered, but he refused to investigate the case on defense counsel's timeline. Defense counsel's main concern was finding the other store clerk and some witnesses who had told the police defendant was not the shooter. He argued it was the prosecution's responsibility to locate these witnesses because the addresses had become stale.

Defense counsel also told the court that witness Cleavon Knott may have received assistance from the police. Knott was scheduled to appear for trial in a misdemeanor case of driving on a suspended license, but the case was advanced and dismissed. The court ordered the prosecutor to check on any assistance given to Knott. Defense counsel noted that, depending on the reasons for the dismissal, the public defender's office might have a conflict of interest because the office had represented Knott. Defendant waived his speedy trial rights, and the matter was continued.

At the next hearing, on December 18, 1995, the prosecutor reported that Detective Wren had indeed helped Cleavon Knott secure a dismissal of his traffic case. Defense counsel reported that the public defender's office did not believe a conflict of interest prevented it from representing defendant, but defendant disagreed. According to counsel, defendant believed there was a conspiracy against him in the office. The court appointed an independent attorney to investigate whether the public defender's representation of Knott created a conflict.

At the same December 18, 1995 hearing, the prosecutor gave written notice of the witnesses he intended to call in both phases of trial. Although defense counsel complained he could not prepare for the penalty phase without more discovery about the Oregon cases, the prosecutor stated he had turned over all the information he had and would continue to share any information he received. Defense counsel explained that some of the problems arose because information was given to an investigator when defendant was representing himself. Counsel had never been able to obtain these materials from the investigator, and attempts to contact the investigator had been futile. In addition, the defense had difficulty conducting a penalty phase investigation because the attorneys and detectives in the Oregon cases were not cooperating.

The defense sought dismissal because of delay, yet maintained it would need "a lot more time" to prepare for trial. Counsel asked that the case be continued to February 5, 1996, but defendant refused to waive time. Counsel stated there was "absolutely no way" he could present the case for trial within the statutory time. Nevertheless, defendant insisted on proceeding with the trial date that had been set. He argued that if defense counsel could not prepare the case by that time, the "only remedy" was for the court to dismiss the case. Defendant refused to waive time and also refused to invoke his right of self-representation. Based on defense counsel's statement that he could not be ready for trial, the court found good cause and continued the case over defendant's objection.

At the next hearing, the court found that the public defender's office did indeed have a conflict. The court relieved Isaacson and appointed panel attorney Randy Short to represent defendant.

On April 24, 1996, defendant moved to dismiss the information on the ground that his statutory and constitutional rights to a speedy trial were violated when the court granted a continuance at the December 18, 1995 hearing over his objection. Defendant claimed he was prejudiced by "delayed discovery, delayed decision on seeking death, delayed investigation by both sides," and representation by an attorney who had a conflict of interest and who rendered ineffective assistance by failing to pursue discovery sanctions. He asserted it was too late to correct these errors and the case had to be dismissed. The court denied the motion. Defendant challenged this ruling in a petition for writ of mandamus or prohibition on May 22, 1996. The Court of Appeal summarily denied the petition. Defendant next sought review in this court. We denied his petition on August 12, 1996. During this time, at defense counsel's request, trial was continued to August 13, 1996. Pretrial motions were argued on August 14 and 20. Voir dire began on August 21, 1996, less than two years after the original complaint was filed. A jury was impaneled on September 3, 1996.

## 2. Analysis

Defendant claims his statutory and constitutional rights to a speedy trial were violated when, at the December 18, 1995 hearing, the court continued the case over his objection. Although his attorney requested this particular continuance, defendant blames the state for the delay in bringing his case to trial. Specifically, he claims prejudice from the prosecution's delays in providing discovery, in disclosing police assistance to a witness, and in deciding whether to seek the death penalty.

■ A criminal defendant's right to a speedy trial is guaranteed by the Sixth Amendment to the federal Constitution and article I, section 15 of the

California Constitution. "The California Legislature has 're-expressed and amplified' these fundamental guarantees by various statutory enactments, including Penal Code section 1382. (*Townsend v. Superior Court* (1975) 15 Cal.3d 774, 779 [126 Cal.Rptr. 251, 543 P.2d 619].)" (*People v. Harrison* (2005) 35 Cal.4th 208, 225 [25 Cal.Rptr.3d 224, 106 P.3d 895].) At all relevant times, section 1382 has required that, "unless good cause to the contrary is shown," the court "shall order the action to be dismissed" if a defendant is not brought to trial within 60 days after the filing of an information. (§ 1382, subd. (a)(2); see Stats. 1992, ch. 278, § 1, p. 1108.)

When defendant refused to waive time and invoked his speedy trial rights at the December 18, 1995 hearing, the case was "6 of 30," meaning that only 24 days remained in the statutory period for bringing the case to trial. (§ 1382, subd. (a).) Defendant's attorney told the court that there was "absolutely no way" he would be ready to try the case within this timeframe, and he asked for a continuance until February 6, 1996, with the statutory clock reset to "0 of 60."

■ "Defense counsel, as part of his or her control of the procedural aspects of a trial, ordinarily has authority to waive the statutory speedy trial rights of his or her client, even over the client's objection, as long as counsel is acting competently in the client's best interest. [Citations.] This is because statutory speedy trial rights are not among those rights that are considered so fundamental that they are 'beyond counsel's primary control.' [Citations.] On the other hand, our concern for the client's right to the assistance of unconflicted counsel has led us to conclude that appointed defense counsel lacks authority to waive his or her client's statutory speedy trial rights when the client personally *objects* to a continuance and the sole reason for the continuance is defense counsel's obligation to another client. [Citations.]" (*Barsamyan v. Appellate Division of Superior Court* (2008) 44 Cal.4th 960, 969 [81 Cal.Rptr.3d 265, 189 P.3d 271].)

Deputy Public Defender Isaacson requested a continuance at the December 18, 1995 hearing because he needed "a lot more time" to prepare the case for trial. He did not ask for more time so that he could concentrate on other cases. (See *People v. Johnson* (1980) 26 Cal.3d 557, 566–569 [162 Cal.Rptr. 431, 606 P.2d 738].) Nor does the record suggest his representation to that point was incompetent or ineffective. (See *Townsend v. Superior Court, supra,* 15 Cal.3d at p. 781 [a continuance granted at the request of defense counsel generally constitutes good cause under § 1382 unless the " 'representation by counsel is so ineffective that it can be described as a "farce and a sham" ' "].) Based on defense counsel's unequivocal statement that he could not present the case for trial within the statutory time, the trial court found good cause to grant a continuance over defendant's objection.

■ "What constitutes good cause for the delay of a criminal trial is a matter that lies within the discretion of the trial court." (*People v. Johnson, supra,* 26 Cal.3d at p. 570.) We review the trial court's exercise of discretion with certain principles in mind. In general, "delay caused by the conduct of the defendant constitutes good cause to deny his motion to dismiss." (*Ibid.;* see *People v. Floyd* (1970) 1 Cal.3d 694, 707 [83 Cal.Rptr. 608, 464 P.2d 64].) Delay for the defendant's benefit also constitutes good cause to continue trial over his objection. (*People v. Johnson,* at p. 570.) "Delay attributable to the fault of the prosecution, on the other hand, does not constitute good cause" for a continuance. (*Ibid.*)

Defendant argues all of the delay in his case was due to the fault or neglect of the prosecution. He contends the prosecution shirked its obligation to provide the defense with updated information about the whereabouts of all material witnesses. (§ 1054.1, subd. (a); see *In re Littlefield* (1993) 5 Cal.4th 122, 135–136 [19 Cal.Rptr.2d 248, 851 P.2d 42]; *Eleazer v. Superior Court* (1970) 1 Cal.3d 847, 851 [83 Cal.Rptr. 586, 464 P.2d 42].) As a result of this delay, defendant asserts, a crucial exculpatory witness was able to leave the country before the defense could interview him. Defendant also faults the prosecution for not promptly furnishing him with discovery about benefits the police provided to witness Cleavon Knott in exchange for his testimony. (See *Giglio v. United States* (1972) 405 U.S. 150 [31 L.Ed.2d 104, 92 S.Ct. 763].) He suggests this delay "impeded disclosure of the public defender's conflict of interest," resulting in further delay of trial. Finally, defendant complains the county's delay in deciding whether to seek the death penalty impaired his ability to prepare a penalty phase defense. These arguments are unpersuasive.

Although the trial court expressed displeasure at the time the prosecution took to reach a penalty decision, there is no indication this delay slowed the proceedings leading up to defendant's trial. The record shows that the prosecutor and defense counsel prudently assumed this would be a capital case and began preparing for a penalty phase months before a decision was made. Moreover, some of this delay was for defendant's benefit, because the committee gave defendant an opportunity to submit mitigating evidence and seek a lesser penalty.

Nor does the record support defendant's claim that a belated disclosure of police assistance to Knott in January 1995 created unjustifiable delay. Defense counsel told the court he had learned of this assistance through an informal conversation with Detective Wren. When counsel raised the issue at the November 21, 1995 hearing, the prosecutor was unaware that any assistance had been given. More importantly, there is no indication defendant was prejudiced by any delay in receiving the information about Knott.

Although this discovery ultimately led to Deputy Public Defender Isaacson's withdrawal from the case, earlier discovery would not necessarily have led to an earlier withdrawal. The public defender's office firmly believed the situation did not create a conflict and even opposed the appointment of an independent attorney to investigate the potential conflict. As the trial court correctly observed, there was no evidence that anyone had deliberately tried to hide a conflict or otherwise prejudice defendant. Indeed, in the end, defendant obtained what he had sought for months: replacement of his court-appointed attorney.

Finally, although defense counsel complained repeatedly about difficulties in locating certain witnesses, the record does not support defendant's claim that the prosecution was dilatory in satisfying its discovery obligations. Defendant's difficulties in this regard stemmed from a number of circumstances outside the prosecution's control. There is no evidence the prosecution did anything to purposefully delay or interfere with defendant's ability to investigate the case. For example, witness addresses were redacted from discovery the prosecution first produced because defendant insisted on representing himself, and the discovery had to be sent directly to him. State law prohibited the prosecution from disclosing witness-identifying information to defendant. (§ 1054.2.) At least some of this information was shared with defendant's court-appointed investigator. However, much later in the case, defendant's attorney told the court he had not received the information and had not been able to contact the investigator.[7]

In addition, some witnesses objected to disclosure of their addresses because they were "terrified" of defendant. It appears this circumstance arose once defendant's investigator began contacting the witnesses. The prosecution reasonably offered to make these witnesses available for interviews at the district attorney's office, and defendant agreed to this arrangement. Defense counsel encountered similar difficulties talking with witnesses in Oregon. Although counsel had their addresses, it was difficult to locate them. Counsel could not obtain updated information from the Oregon police, and attorneys for the Oregon codefendants were not cooperating. Once again, however, these problems cannot be blamed on the prosecution. The prosecutor repeatedly affirmed that he had given defense counsel all the information he had about the Oregon cases and promised to promptly share any new information.

In short, there is no indication the prosecution stonewalled or delayed in producing discovery in its possession. In August 1995, defense counsel acknowledged that most of the discovery he sought had been provided, and

---

[7] There was also a hiatus of approximately five months, from December 1994 through May 1995, while defendant obtained a dismissal of the first case and was arraigned on the same charges in the second case. It is unclear whether discovery continued during this period.

praised the police department's cooperation in sharing physical and documentary evidence. Reflecting this cooperation, defense counsel never sought discovery sanctions against the prosecution. Defendant now blames the prosecution for his inability to locate the other clerk, Somphop Jardensiri. However, Jardensiri was an independent witness and not under the prosecution's control. (See *Bellizzi v. Superior Court* (1974) 12 Cal.3d 33, 36–37 [115 Cal.Rptr. 52, 524 P.2d 148] [distinguishing the unavailability of this type of witness from that of a police informant].) There is no indication the prosecution knew of his intention to leave the country or his whereabouts thereafter. Under these circumstances, "it would be unreasonable to hold the People accountable" for the witness's unavailability. (*Id.* at p. 37.) In contrast, defendant himself is to blame for much of the delay in the proceedings. He repeatedly invoked his right of self-representation in attempts to manipulate the court into appointing a different attorney. At times, he refused to communicate with Deputy Public Defender Isaacson, and he refused to meet with Isaacson to receive discovery materials Isaacson had brought to the jail. Defendant caused further delay when, in protest of an order that he wear a stun belt, he simply refused to come to court.

■ When defendant refused to waive time at the December 18, 1995 hearing despite his attorney's plea that he was "absolutely" not ready to proceed and needed more time to prepare the case for trial, the situation presented a classic confrontation between defendant's statutory and constitutional rights to a speedy trial and his Sixth Amendment right to competent and adequately prepared counsel. (See *Townsend v. Superior Court, supra,* 15 Cal.3d at p. 782; see also *People v. Frye* (1998) 18 Cal.4th 894, 938–939 [77 Cal.Rptr.2d 25, 959 P.2d 183].) If counsel seeks reasonable time to prepare a defendant's case, and the delay is for defendant's benefit, a continuance over the defendant's objection is justified. (*Townsend,* at p. 784.) Likewise here, the trial court did not abuse its discretion in granting a continuance when counsel announced he was not ready to try a death penalty case. Although ·defendant now argues otherwise, a continuance to permit further investigation and preparation was clearly in his best interest. ■ "Although a criminal defendant may not be deprived of a speedy trial because the prosecution—or the defense—is lazy or indifferent, or because the prosecution seeks to harass the defendant rather than bring him fairly to justice, a criminal defendant may not juggle his constitutional rights in an attempt to evade prosecution. He may not demand a speedy trial and demand adequate representation, and, by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between the two demands, in the hope that a reviewing court will find that the trial court has made the wrong choice." (*People v. Floyd, supra,* 1 Cal.3d at p. 707.)

■ The challenges under section 1382 and article I, section 15 of the California Constitution also fail because defendant has not shown he was

prejudiced by the delay of trial. Although a defendant seeking pretrial relief for a speedy trial violation is not required to make an affirmative showing of prejudice (*Sykes v. Superior Court* (1973) 9 Cal.3d 83, 88–89 [106 Cal.Rptr. 786, 507 P.2d 90]), the situation is different after judgment. (*People v. Johnson, supra,* 26 Cal.3d at p. 574; *People v. Wilson* (1963) 60 Cal.2d 139, 151 [32 Cal.Rptr. 44, 383 P.2d 452].) "Upon appellate review following conviction, . . . a defendant who seeks to predicate reversal of a conviction upon denial of his right to speedy trial must show that the delay caused prejudice: this court, in reviewing the judgment of conviction, must 'weigh the effect of the delay in bringing defendant to trial or the fairness of the subsequent trial itself.' " (*People v. Johnson,* at p. 574.)

■ Defendant first claims prejudice because, if the trial court had granted his motion to dismiss, the state would have been barred from refiling the charges against him. Not so. Subject to certain exceptions, section 1387, subdivision (a) prohibits renewed prosecution for the same offense if the matter has been dismissed twice for speedy trial violations. However, section 1387.1 gives the prosecution one more opportunity to pursue charges under these circumstances if the alleged offense is a violent felony and the prior dismissals were due to excusable neglect. Section 1387, subdivision (a) would have come into play if the court had granted defendant's motion to dismiss, because he obtained a previous dismissal for violation of the speedy preliminary hearing statute (§ 859b). Nonetheless, the charges could have been refiled under section 1387.1 because there is no evidence of bad faith or inexcusable neglect by the prosecution.

Next, defendant claims he was prejudiced because the delay in bringing his case to trial caused the loss of exculpatory evidence. To support this argument, he cites only the example of the clerk Jardensiri, "a potentially crucial exculpatory witness [who] disappeared during the delay." According to defense counsel, Jardensiri told the police that Angela Toler fired at him after he emerged from the back of the store during the robbery. This statement was directly refuted by the physical evidence showing that all rounds fired in the store came from a Glock nine millimeter and *not* Toler's weapon. Even if Toler had fired at the other employee, that fact would not significantly undermine the substantial evidence that defendant had fired the shots that killed Akbar. But assuming Jardensiri could have given helpful testimony for the defense, his unavailability cannot be blamed on a delay of trial. Jardensiri left the United States quite early in the proceedings. The last indication that he was in the country came in January 1995, when he spoke to Toler's probation officer. On February 17, 1995, the prosecutor told the court that a witness (apparently referring to Jardensiri) had returned to Cambodia. With only one exception (regarding a continuance sought by his then codefendant Toler), defendant had either agreed to or requested all continuances granted up to that point. Moreover, the evidence about Jardensiri's

asserted "disappear[ance]" is lacking. During the period from mid-September until early December 1994, when defendant represented himself, defendant's investigator was able to contact some witnesses, including Cleavon Knott. Defendant has never claimed that he lacked contact information for Jardensiri, nor has he stated whether his attorney or investigator attempted to contact, or did contact, this witness before he left the country. Indeed, the record does not disclose *any* efforts by the defense to locate Jardensiri.

■ Defendant's federal constitutional claim also fails. (U.S. Const., 6th & 14th Amends.) To determine whether the federal speedy trial right was violated, we evaluate four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Barker v. Wingo* (1972) 407 U.S. 514, 530 [33 L.Ed.2d 101, 92 S.Ct. 2182].) Defendant was in custody for almost two years from the time he was arrested until his trial began. This duration is not inordinately long for a death penalty case. During this time defendant received two preliminary hearings. He also sought writ review twice at the Court of Appeal and once in this court. Moreover, nearly all of the delay was caused by the defense. Defendant's attorneys, and defendant himself, requested numerous continuances to prepare for the preliminary hearing and trial, and additional delays are attributable to defendant's gamesmanship in repeatedly invoking, and revoking, his right of self-representation. In a federal speedy-trial analysis, "a defendant's deliberate attempt to disrupt proceedings [must] be weighted heavily against the defendant." (*Vermont v. Brillon* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 231, 129 S.Ct. 1283, 1292].) Defendant's sporadic assertion of his speedy trial right appeared to be used as a means to provoke confrontation with his attorney and to express displeasure when his wishes were not granted. Defendant's assertion of the right thus appears to be stronger evidence of his dissatisfaction with the court and appointed counsel than of a speedy trial violation. (See *Barker v. Wingo*, at pp. 531–532.) Finally, for the reasons we have discussed, defendant has not shown he was prejudiced by the delay.

### B. *Stun Belt*

Defendant argues the court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments, and his corresponding state constitutional rights, by ordering him to wear an electronic security belt during trial. We conclude this order was an appropriate exercise of the court's discretion.

■ In general, the "court has broad power to maintain courtroom security and orderly proceedings" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645]), and its decisions on these matters are reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 633 [101 Cal.Rptr.3d 14, 218 P.3d 272].) However, the court's discretion to

impose physical restraints is constrained by constitutional principles. Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322].) Similarly, the federal "Constitution forbids the use of visible shackles . . . unless that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 624 [161 L.Ed.2d 953, 125 S.Ct. 2007], italics omitted.) We have held that these principles also apply to the use of an electronic "stun belt," even if this device is not visible to the jury. (*People v. Mar* (2002) 28 Cal.4th 1201, 1219 [124 Cal.Rptr.2d 161, 52 P.3d 95].)

■ "In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' (*Deck v. Missouri, supra*, 544 U.S. at p. 629.) These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior." (*People v. Gamache* (2010) 48 Cal.4th 347, 367 [106 Cal.Rptr.3d 771, 227 P.3d 342].) Although the court need not hold a formal hearing before imposing restraints, "the record must show the court based its determination on facts, not rumor and innuendo." (*People v. Stevens, supra*, 47 Cal.4th at p. 633.) The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion. (*People v. Duran, supra*, 16 Cal.3d at p. 291.)

At a pretrial hearing in November 1995, the court described a violent incident that had occurred on September 27, 1995, in a courthouse holding cell: "The defendant was taken from this courtroom by the regular bailiff in this courtroom. He was taken down to lock-up and told to go into a side cell. The defendant objected and pointed out that his belongings were in another cell. Deputy McCaleb explained that he had no key to that other cell [and would have] to put the defendant in the side cell, go and get the key[,] and then . . . move the defendant into the . . . cell . . . containing his belongings. Deputy McCaleb had taken the handcuffs off the defendant at that point. . . . The defendant then struck my bailiff four or five times. All blows were to the head. My bailiff was calling out for another. . . . The moment that other deputy appeared and was close enough to use pepper spray, the defendant stopped his attack and walked into the cell. The deputy hit suffered a slight concussion and was off work for nearly three weeks and was on light duty for some period of time."

On February 5, 1996, the trial court ordered defendant to wear a REACT security belt[8] because of his attack on the bailiff. At the next hearing, on March 8, 1996, defense counsel asked the court to reconsider this order, noting that defendant had caused no major disturbances in the courtroom itself. The court rejected this request, stating, "This man assaulted my bailiff without the least provocation. . . . I will not have my staff subject to that risk." In the alternative, defendant asked that the belt not be used until it had been approved by a doctor after a medical examination. The court signed an order for this examination but required defendant to wear the belt for the morning's hearing. Defendant did not attend the hearing and refused to come to the next hearing because of the requirement that he wear a REACT belt. On March 21, 1996, defendant moved to disqualify the trial judge (Code Civ. Proc., § 170.1, subd. (a)(6)), claiming the judge's order requiring a REACT belt in response to an alleged assault on her bailiff indicated the judge was biased against him. The motion was denied.

On August 2, 1996, defendant filed a *Pitchess* motion[9] to discover Deputy Joseph McCaleb's personnel records. (Evid. Code, § 1045, subd. (a).) Attached to this motion were copies of a sheriff's department complaint report, an inmate injury report, and an emergency room medical report, all concerning the September 27, 1995 incident. In the complaint report, the deputy who helped McCaleb related the same sequence of events the trial court had described. Defendant refused to enter the lockup cell as directed. Irate, he "turned and hit Deputy McCaleb above the left eye with his right fist," then continued punching the deputy "five more times in the face" with both fists. When McCaleb called for help, the responding deputy saw defendant hitting McCaleb in the face. Deputy McCaleb said he tried to defend against the attack. Defendant had a small abrasion over his right eye, but medical staff felt no treatment was necessary. Deputy McCaleb sustained lacerations and hematomas on both sides of his forehead. He was treated at a Long Beach fire station but opted not to go to the hospital. Deputy McCaleb's radio was also damaged in the incident.[10]

At a pretrial conference on August 13, 1996, defendant objected to wearing the REACT belt during trial. Defendant feared a deputy could misuse the device and shock him even when he was behaving properly. Defendant also claimed he had an unspecified heart problem that would make the belt especially dangerous for him. The court opined that the belt was superior to

---

[8] We discussed the remote electronically activated control technology (REACT) belt in *People v. Mar*, *supra*, 28 Cal.4th at page 1214. As we explained in *Mar*, this battery-operated belt " 'consists of a four-inch-wide elastic band, which is worn underneath the prisoner's clothing.' " (*Ibid.*) If activated by its remote transmitter, the belt can deliver a brief 50,000-volt electric shock. (*Id.* at p. 1215.)

[9] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305].

[10] The sheriff's department ultimately found no records responsive to the *Pitchess* request.

chains and manacles because it would not be visible to the jury. The court also remarked that the belt was safe and would be activated only if defendant was attempting to escape or "using some violence on somebody in the courtroom." Speaking directly to the court (not through counsel), defendant asked for a hearing to present different facts about the assault on Deputy McCaleb. Defendant claimed he had 14 witnesses who would say that McCaleb attacked him and defendant was merely protecting himself. Defendant also reminded the court that he had no discipline problems during the 10 months he spent in jail before the incident with Deputy McCaleb. The court asked if defendant preferred to wear a waist chain and leg shackles. When defendant objected to wearing "any kind of shackles," his attorney interrupted, saying, "As his counsel, I would rather have the REACT belt on him, but I really wish that he would be examined by a doctor and make sure this is safe."

The court signed another order directing that defendant have a medical examination "for heart problems that would prevent him from wearing the 're-act belt.' " On August 19, 1996, a physician with the Los Angeles County Sheriff's Department reported the results of this examination. Defendant had a diagnosis of hypertension, which was controlled by medication, but his medical history revealed "no contra-indication to use of the re-act belt."

■ Defendant argues there was no manifest need for him to be restrained with a stun belt and no evidence supported the court's order. In past cases, we have stressed that information regarding violence or other nonconforming behavior supporting a decision to impose physical restraints "must appear as a matter of record . . . ." (*People v. Duran, supra,* 16 Cal.3d at p. 291; see also *People v. Mar, supra,* 28 Cal.4th at pp. 1220–1221.) When the objectionable conduct has occurred outside the courtroom, "sufficient evidence of that conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for [physical] restraints; the court may not simply rely upon the judgment of law enforcement or court security officers or the unsubstantiated comments of others." (*People v. Mar,* at p. 1221.) Because the court failed to conduct a formal hearing before it ordered restraints, defendant claims the record is deficient. However, we have held that a formal hearing is not required, so long as the court makes its own determination about the need for restraints based on facts shown to it, and does not simply defer to the recommendation of law enforcement. (*People v. Cox* (1991) 53 Cal.3d 618, 651–652 [280 Cal.Rptr. 692, 809 P.2d 351]; see also *People v. Hill* (1998) 17 Cal.4th 800, 841–842 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Here, the trial court expressly *made* a record of facts brought to its attention. A detailed incident report describing defendant's attack on Deputy McCaleb had also been presented to the court before trial, in connection with defendant's *Pitchess* motion.

This record contains a clear presentation of the facts surrounding defendant's violent outburst in the holding cell. The record also reflects that, despite raising additional concerns about the possibility of escape, the trial court primarily relied on facts about the attack on Deputy McCaleb in ordering defendant to wear the stun belt. The court repeatedly expressed concern for protecting jurors and members of court staff. Moreover, defendant's unprovoked violent attack on the deputy clearly justified the imposition of restraints to prevent a recurrence of such behavior in the courtroom. (See, e.g., *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1032 [47 Cal.Rptr.3d 467, 140 P.3d 775] [defendant attacked another inmate and threatened to kill deputies]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 95–96 [270 Cal.Rptr. 817, 793 P.2d 23] [defendant threatened escape, threatened violence against the judge and deputies, and assaulted other inmates]; *People v. Sheldon* (1989) 48 Cal.3d 935, 945 [258 Cal.Rptr. 242, 771 P.2d 1330] [defendant assaulted five other inmates and was thought to be a " 'high escape risk' "].)

■ Defendant also complains that the court failed to consider the potential physical harm and psychological impact of the REACT belt when it rejected alternative security measures. Generally, when physical restraints are called for, a trial court should impose "the least obtrusive or restrictive restraint" that will ensure effective security. (*People v. Mar, supra*, 28 Cal.4th at p. 1226.) The trial court here found the REACT belt "the best security device" available "from the point of view of appearance" because, unlike chains and manacles, the belt is not visible to the jury. The court also remarked that the device was "the safest" for a defendant because it would not be activated unless the defendant attempted to escape or use violence on someone.

In *People v. Mar, supra*, 28 Cal.4th at pages 1225–1230, we examined the potential psychological consequences of wearing a stun belt and the physical effects from electric shock in subjects with certain medical conditions. However, recognizing that our decision was the first to consider use of the REACT belt in California criminal trials, we expressly stated that our discussion of these topics was offered to provide guidance "in *future* trials." (*Id.* at p. 1225, italics added; see also *id.* at p. 1230.) Defendant's trial occurred six years before our decision in *Mar*. The trial court was not required to foresee and discuss each of the concerns detailed in that opinion. (See *People v. Gamache, supra*, 48 Cal.4th at p. 367, fn. 7.) In any event, the court twice ordered a medical examination to ensure that defendant was not susceptible to physical harm from wearing the device. Although not required to do so, the court gave defendant the option of wearing a waist chain and leg shackles instead of the REACT belt. Thus, he could have chosen these traditional alternative restraints.

## C. *Detention*

Defendant next complains the trial court erred in denying his suppression motion (§ 1538.5) because his detention was pretextual and discriminatory. Specifically, defendant claims the police violated his state and federal constitutional rights to equal protection and freedom from unreasonable seizures and violated a state law against racial profiling (§ 13519.4). In reviewing a suppression ruling, "we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found. [Citations.]" (*People v. Woods* (1999) 21 Cal.4th 668, 673–674 [88 Cal.Rptr.2d 88, 981 P.2d 1019].)

At a hearing on defendant's motion, Officer Timothy Everts testified that shortly after midnight on August 29, 1994, he saw a green Ford Taurus make an illegal lane change. The car traveled straight through an intersection from a left-turn lane. About an hour earlier, Officer Everts and his partner had been told about a robbery murder committed in the area. The suspects, one male and one female, were believed to be driving a compact dark green or blue Oldsmobile. Both were African-American, and the male was described as having dreadlocks. The officers saw two African-American females in the front seats of the green Taurus and an African-American male in the back. He wore cornrow braids, which Officer Everts thought could be mistaken for dreadlocks. The officers activated the patrol car's lights, but the Taurus did not stop immediately. During this time, the back passenger's shoulders were moving back and forth, indicating hand movements. When the car stopped, Officer Everts approached on the rear passenger side. Because the vehicle and its occupants were consistent with the description of the robbery suspects, Everts was concerned about officer safety and walked with his weapon drawn. Defendant was sitting on the right passenger side of the backseat and appeared to have his hands between his legs. After the suspects were ordered out of the vehicle and found to be unarmed, Officer Everts returned to look through the window into the rear passenger seat. He saw a Glock nine-millimeter semiautomatic handgun sticking out of the map holder pocket. The officers handcuffed defendant and searched the car. In addition to the Glock, they found a smaller semiautomatic handgun wedged in the front between the driver's seat and the center console.

In moving to suppress the evidence seized, defendant did not challenge the legality of the traffic stop. Instead, he argued the ensuing detention and search of the vehicle were unlawful. Focusing on dissimilarities between the appearance of his hair and vehicle and the description the police had received of the robbery suspects and their vehicle, defendant argued the police lacked reasonable suspicion to detain him or search inside the car. Defendant also

challenged Officer Everts's testimony that he saw the Glock handgun in plain view as "a credibility issue." The trial court denied the motion, concluding the officers were not acting "on a hunch," but had enough information to justify removing the suspects from the car. The court also credited Officer Everts's testimony that the gun was in plain view. Defendant renews his arguments on appeal.

■ "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (*Whren v. United States* (1996) 517 U.S. 806, 810 [135 L.Ed.2d 89, 116 S.Ct. 1769].)[11] If there is a legitimate reason for the stop, the subjective motivation of the officers is irrelevant. (*Whren*, at pp. 811–813.) Defendant concedes probable cause supported the initial stop for an illegal lane change. He argues the police did not have sufficient cause to detain him and his companions further to investigate whether they were involved in the robbery murder. However, it is well settled that *no individualized suspicion whatsoever* was required in these circumstances. (*Maryland v. Wilson* (1997) 519 U.S. 408, 414–415 [137 L.Ed.2d 41, 117 S.Ct. 882]; see also *id.* at pp. 420, 422 (dis. opn. of Stevens, J.).) ■ Once a vehicle has been detained in a valid traffic stop, police officers may order the driver *and passengers* out of the car pending completion of the stop without violating the Fourth Amendment. (*Maryland v. Wilson*, at pp. 414–415; *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111 & fn. 6 [54 L.Ed.2d 331, 98 S.Ct. 330].)

■ Defendant also complains that, after he and his companions were standing outside at the front of the car, Officer Everts did not have good cause to walk back and look inside the rear passenger window. However, no such cause was required here. The officer made his observation of an item in plain view from a position where he had the right to be. Such conduct does not constitute a search. (*Minnesota v. Dickerson* (1993) 508 U.S. 366, 375 [124 L.Ed.2d 334, 113 S.Ct. 2130].) The officer was justified in seizing the gun and searching for additional weapons. (*Ibid.*; *Horton v. California* (1990) 496 U.S. 128, 135–137 [110 L.Ed.2d 112, 110 S.Ct. 2301]; see also *Michigan v. Long* (1983) 463 U.S. 1032, 1050 [77 L.Ed.2d 1201, 103 S.Ct. 3469].) There was no Fourth Amendment violation.

■ Citing discrepancies between his appearance and the description of the robbery suspects, defendant also complains his detention was the result of racial profiling. He argues the officers' actions violated the equal protection clause of the Fourteenth Amendment and a California statute that directs law enforcement officers to refrain from racial profiling. (§ 13519.4, subd. (f).)

---

[11] We review challenges to the admissibility of evidence obtained by a police search and seizure under federal constitutional standards. (*People v. Woods, supra,* 21 Cal.4th at p. 674; Cal. Const., art. I, § 28, subd. (d).)

However, there is no dispute the police had probable cause to stop defendant's vehicle when it made an illegal lane change. When the police have a description of a criminal suspect, they may rely on that description, including race, to determine whether there is probable cause to justify their actions. (*Whren v. United States, supra*, 517 U.S. at pp. 811–813.)

### D. *Juror Issues*

#### 1. *Cause Challenges*

Defendant argues the court violated his rights under the Sixth, Eighth and Fourteenth Amendments when it excluded two prospective jurors for cause. A juror may be discharged if, at any time before or after final submission of the case, the court upon good cause finds the juror "unable to perform his or her duty." (§ 1089.) " ' "In general, the qualification[s] of jurors challenged for cause are 'matters within the wide discretion of the trial court, seldom disturbed on appeal.' " ' [Citation.]" (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1036 [90 Cal.Rptr.2d 607, 988 P.2d 531].) We find no abuse of discretion.

##### a. *Prospective Juror Robert J.*

Prospective Juror Robert J., a 28-year-old man from Croatia, gave several unusual responses in his questionnaire. For example, he described his race as "human," and, when asked if he had received training in psychology, psychiatry or medicine, he answered, "lived with them for a while." He reported that his aunt had been tried for the first degree murder of his uncle but responded only with a question mark when asked to state the outcome of the proceeding. He said he knew "defendant's, witnesses [*sic*]" involved in the case and, despite being advised defendant could choose not to testify, said he would hold a failure to testify against defendant. Similarly, although he was told the delay between the date of the crimes and trial was not relevant, Robert J. said he would evaluate the evidence differently than he would evidence of a recent crime. When asked whether he would evaluate the testimony of an accomplice based on what he saw and heard in court and the court's instructions, Robert J. checked both the "yes" and "no" boxes.

Robert J.'s written responses about law enforcement were also notable. Asked if he thought the testimony of law enforcement personnel would be more truthful than civilian testimony, Robert J. wrote three large, underlined X's in the "no" box and stated, "They lie too much." When asked whether law enforcement testimony would be less truthful, Robert J. placed large X's in both the "yes" and "no" boxes, then apparently crossed out both of these answers and wrote, "Depends on situation." He did not answer a question

inquiring whether he would be an impartial juror, but wrote in, "Do not know what asked?" Robert J. responded only with large question marks when asked whether he would refuse to vote for guilt, despite the evidence, to avoid a penalty phase, and whether, if there were a penalty phase, he would always vote for death. Finally, when asked if he would base his decisions as a juror solely on the evidence and instructions presented at trial, Robert J. wrote in a question mark and the statement, "Look at it all in different ways."

After clarifying that the prospective juror did not in fact know the defendant or any witnesses in the case, the court questioned Robert J. about his statement that law enforcement officers "lie too much." He explained he knew from personal experience that police officers lie because officers once wrongly said they had seen him commit an assault. Robert J. said his belief that police officers lie would have no effect on how he judged this case, however. He observed, "Everybody can lie," and explained he would "look at the roundabout part of everybody." The trial court asked whether Robert J. would judge the credibility of all witnesses by the same standard. He appeared not to understand the question. When the court repeated it, Robert J. responded: "Everybody that testifies or says anything about the case I'll put them all together in one. There won't be nobody like picked out saying in my own mind like I believe you more than you. Everybody will be believed in the same way."

■ Based on these responses and statements in the questionnaire, the court granted the prosecution's challenge to Robert J. over defendant's objection. The court found that Robert J. was incompetent to act as a juror based on his inability to understand and use the English language. "Insufficient command of the English language to allow full understanding of the words employed in instructions and full participation in deliberations clearly . . . render[s] a juror 'unable to perform his duty' within the meaning of Penal Code section 1089." (*People v. Elam* (2001) 91 Cal.App.4th 298, 316 [110 Cal.Rptr.2d 185]; see also *People v. Szymanski* (2003) 109 Cal.App.4th 1126, 1131–1132 [135 Cal.Rptr.2d 691]; Code Civ. Proc., § 228, subd. (b) [a person is disqualified from serving if an incapacity makes him incapable of performing the duties of a juror].) Substantial evidence supports the trial court's finding. Robert J. was unable to answer several important questions on the questionnaire, including the most crucial inquiries about whether he could be an impartial juror and base his decision solely on the evidence and instructions presented. His large question marks in response to these questions, and his candid admission that he "[did] not know what [was] asked" with regard to impartiality, indicate he had difficulty understanding English. The same problem is reflected elsewhere in incomplete, equivocal, and inaccurate answers. In oral questioning, Robert J.'s rambling responses to the court's repeated questions about how he would judge witnesses' credibility suggest he did not fully understand the meaning of the word "credibility."

The responses also indicate that Robert J. might have had substantial difficulty communicating during deliberations.

Apart from the language issue, Robert J. made several written and oral statements revealing he would not be able to serve as a fair and impartial juror. He candidly admitted a belief that police officers are inclined to lie, and he never gave a direct answer when asked whether he could be an impartial juror.

The trial judge was best situated to observe the prospective juror's demeanor and evaluate his competence to serve. (See *Patton v. Yount* (1984) 467 U.S. 1025, 1038 [81 L.Ed.2d 847, 104 S.Ct. 2885] [trial court's decision to excuse potential juror is entitled to special deference].) We conclude the court did not abuse its discretion in discharging Robert J.

### b. *Prospective Juror Joyce B.*

Defendant also challenges the court's decision to excuse Prospective Juror Joyce B. based on her opposition to the death penalty. "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].)" (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519].) "If a juror's responses are conflicting or equivocal, the trial court's ruling is binding on us. [Citations.] If not, we will uphold the trial court if the ruling is fairly supported by substantial evidence in the record, giving deference to the trial court which had the opportunity to observe and listen to the juror. [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 651 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

When asked on the juror questionnaire to describe her general feeling or opinion regarding the death penalty, Joyce B. responded, "neither for nor against[;] it just exists." During voir dire, the trial court probed this response, noting that if the case reached a penalty phase the juror would have to "confront [her] decision-making" on the subject. The court then asked whether Joyce B. had anything more to say about her general feeling or opinion toward the death penalty. She declined, saying, "No. No." The court

then asked four previously agreed-upon *Hovey* voir dire questions[12] to determine whether the prospective juror would automatically vote for or against the death penalty, or would vote against the evidence on guilt or special circumstance allegations to avoid reaching the death penalty question. Joyce B. answered "no" to each.

The prosecutor complained it was difficult to accept that Joyce B. had no feeling one way or the other about capital punishment and asked the court to inquire further. The court emphasized the importance of the issue and asked the prospective juror, "What is your own philosophy? What is it that you can see yourself doing if the evidence calls for it? I mean do you have any opinion as being in favor for the death penalty or opposed to it?" Joyce B. responded, "Well, I suppose if I—if I were forced to say—to vote one way or the other I would vote against it. Against the death penalty period." The court then explained it is a juror's job to vote for the appropriate penalty and asked, "Are you saying that you will definitely vote against death?" Joyce B. responded, "I guess it would depend on what I heard in the courtroom. It's hard to say that yes or no when I don't know." Defense counsel objected to further questioning. Because Joyce B. had given neutral responses in her questionnaire, counsel asserted she should not be forced to explain her neutrality. The court disagreed with this characterization, noting that Joyce B. gave conflicting statements when she said she would vote against death but also said she would listen to the evidence. The court also found Joyce B.'s statement that the death penalty " 'just exists' " puzzling, "because for a juror dealing with that issue, . . . it has to do a whole lot more than just exist." The court then asked, "Are you able to give us any more information, Ms. B[.]?" She responded, "I guess I'm against it."

Based on this questioning, the court granted the prosecutor's challenge for cause and excused Prospective Juror Joyce B. The record adequately supports this ruling. The trial court was clearly troubled by Joyce B.'s assertion that she had no opinion about the death penalty and that "it just exists." This

---

[12] *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. (*Hovey*'s holding that prospective jurors in capital cases should be sequestered and questioned individually about their views on the death penalty has been superseded by Code Civ. Proc., § 223.) The questions asked here were: "Do you have such a conscientious objection to the death penalty that, even if the People prove beyond a reasonable doubt the defendant is guilty of first degree murder, you would vote not guilty just to avoid reaching the death penalty question?" "Do you have such a conscientious objection to the death penalty that, even if the People prove beyond a reasonable doubt the special circumstances are true, you would vote not true just to avoid getting to the death penalty question?" "Do you have such a conscientious objection to the death penalty that you would automatically vote against death even if you actually felt that death was the appropriate decision based on the facts and the law?" "Do you have such a conscientious opinion in favor of the death penalty that you would automatically vote for death even if you actually felt that death was not the appropriate decision under the facts and the law?"

statement raised doubts about the prospective juror's candor on the subject and prompted further questioning. Joyce B. then gave conflicting and equivocal responses when her feelings about capital punishment were probed. Although she had expressed neutrality in the questionnaire and gave appropriate answers to the standard *Hovey* questions, Joyce B. eventually told the court she would "vote against it. Against the death penalty period." She then refused to give a simple "yes" or "no" answer when the court asked whether Joyce B. meant she would "definitely vote against death."

A trial court's ruling on a cause challenge is entitled to deference on appeal because "a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record. [Citation.]" (*People v. Stewart* (2004) 33 Cal.4th 425, 451 [15 Cal.Rptr.3d 656, 93 P.3d 271].) Even when, as here, the written record does not clearly demonstrate bias, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." (*Wainwright v. Witt, supra,* 469 U.S. at pp. 425–426.) Joyce B. gave conflicting and equivocal answers and said she would vote "[a]gainst the death penalty period." The totality of the record supports the trial court's conclusion that Joyce B. could not impartially perform her duties as a capital juror.

### 2. *Peremptory Challenges*

Defendant, who is African-American, urges he was deprived of his constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges to exclude African-Americans from the jury. (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).)

The three-step inquiry governing *Wheeler/Batson* claims is well established. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 [80 Cal.Rptr.3d 98, 187 P.3d 946]; see also *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410].)

Three African-American prospective jurors were among the original 12. The prosecutor used his first peremptory challenge to strike one of these, Prospective Juror Gloria Y. He then struck three jurors who were not African-American and accepted the panel five times before excusing another African-American from the original group, Prospective Juror Robbie W. Later, the prosecutor used his 10th peremptory challenge to excuse the remaining African-American from the original panel, Prospective Juror Darnell F. As the parties exercised their challenges, six additional African-Americans were seated in the jury box. Of these six, the prosecutor struck three: Prospective Jurors Ricky W., Jonathan S., and, after the court denied defendant's *Wheeler* motion, Stephanie M.-H.[13]

Defense counsel moved to quash the venire after the prosecutor used his 14th peremptory challenge to excuse a fifth African-American panelist. The court found that defendant had made a prima facie showing of discrimination "based on the numbers" and asked for the prosecutor's response. After the prosecutor gave his reasons for excusing each prospective juror, the court stated that it had evaluated these reasons and consulted its own notes on the excused panelists. The court remarked, "In each case I have myself seen reasons why there might be an excusal or a challenge. . . ." The court ruled that there had been "no systematic exclusion of jurors based on race" and denied the motion.

The People do not dispute that a prima facie showing was made. Accordingly, we focus on the third *Wheeler/Batson* prong and examine whether the African-American panelists were excused due to intentional discrimination. (See *People v. Mills* (2010) 48 Cal.4th 158, 174 [106 Cal.Rptr.3d 153, 226 P.3d 276]; *People v. Lenix*, *supra*, 44 Cal.4th at p. 613, fn. 8.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted

---

[13] Defendant made his *Wheeler* motion after the prosecutor had excused a fifth African-American prospective juror. In the course of responding to the motion, the prosecutor noticed that Prospective Juror Stephanie M.-H. would soon be placed in the box. Because he "certainly" intended to excuse this panelist when the time came, the prosecutor offered his reasons for challenging her. Shortly after the *Wheeler* motion was denied, Prospective Juror Stephanie M.-H. was briefly seated and then excused by the prosecutor. Defendant did not renew his *Wheeler* motion and thus arguably has forfeited any arguments concerning this prospective juror's dismissal. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 490, fn. 18 [110 Cal.Rptr.3d 673, 232 P.3d 663].) However, because the prosecutor offered his reasons for challenging Ms. M.-H., and the trial court considered these reasons in denying the *Wheeler* motion, we include this prospective juror in our analysis.

trial strategy.' (*Miller-El* [*v. Cockrell* (2003)] 537 U.S. [322,] 339 [154 L.Ed.2d 931, 123 S.Ct. 1029].) In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. (See *Wheeler*, *supra*, 22 Cal.3d at p. 281.)" (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613, fn. omitted.)

"We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) The trial court here made such a "sincere and reasoned" evaluation when it considered the prosecutor's response and reviewed its own notes about the excused panelists. Accordingly, its decision must be upheld on appeal if it is supported by substantial evidence. (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.)

■ We have reviewed the record surrounding each of the challenges. In his opening brief, defendant urges us to conduct a comparative juror analysis. He argues a comparison of African-American panelists who were challenged with panelists of other races who were allowed to serve on the jury would reveal that the prosecutor's reasons for striking the African-Americans were pretextual.[14] "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to

---

[14] Defendant expands on this argument in his reply brief. However, instead of comparing the challenged African-American panelists to panelists of other races who were allowed to serve, the reply brief attempts to compare the challenged African-American panelists with panelists of other races *who were also challenged* by the prosecutor. The relevance of this comparison is questionable. (See *People v. Lenix*, *supra*, 44 Cal.4th at p. 631.) In general, a comparative juror analysis "compares panelists who were struck with those who were allowed to serve or were passed by the prosecution before being ultimately struck by the defense." (*Ibid.*) Defendant's point seems to be that these non-African-American prospective jurors were even more problematic for the prosecution than the African-Americans who were challenged. But because the prosecutor used his peremptory challenges to excuse these prospective jurors, in many cases before he used a peremptory to excuse an African-American panelist, we fail to see how the comparison is evidence that the challenges to African-Americans were motivated by race. That some panelists of other races may have been even more worthy of a peremptory challenge does not mean that the excused African-American panelists were improperly discharged. The more telling comparison is between "black venire panelists who were struck and white panelists allowed to serve." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241 [162 L.Ed.2d 196, 125 S.Ct. 2317]; see also *People v. Lenix*, at pp. 630–631.)

serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El v. Dretke, supra*, 545 U.S. at p. 241.) We have recently explained that "comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*People v. Lenix, supra*, 44 Cal.4th at p. 622.) Although we must consider comparative juror analysis evidence raised for the first time on appeal (see *ibid.*), our focus is limited to the responses of stricken panelists and seated jurors that have been identified by defendant in his claim of disparate treatment. (*Id.* at p. 624.) Having reviewed the record and conducted a comparative analysis where required, we conclude substantial evidence supports the trial court's ruling.

■ In responding to the *Wheeler/Batson* motion, the prosecutor explained that, in general, he was seeking the strongest possible jurors for the penalty phase. Accordingly, he was wary of keeping prospective jurors who expressed a neutral philosophical position toward the death penalty. He stated, "I want people who are going to be able to work together and people who are going to take a strong enough position with regard to the death penalty. If it's something that they either don't believe in or [are] very weak in their feelings, I think we are going to have a real difficult time when it comes to penalty phase." Defendant protests that rejecting a juror based on the juror's expressed "neutrality is tantamount to finding a juror unacceptable because he or she is unbiased." This is a flawed comparison. As we have observed in the past, a juror's decision whether to impose the death penalty has moral and normative underpinnings. (See *People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].) A juror's philosophical position on capital punishment is directly relevant and may factor into penalty phase decisionmaking, but the same cannot be said of bias. A juror is, of course, obligated to set aside all biases and view the evidence impartially. Moreover, even when jurors have expressed neutrality on the death penalty, "neither the prosecutor nor the trial court [i]s required to take the jurors' answers at face value." (*People v. Boyette* (2002) 29 Cal.4th 381, 422 [127 Cal.Rptr.2d 544, 58 P.3d 391].) If other statements or attitudes of the juror suggest that the juror has "reservations or scruples" about imposing the death penalty, this demonstrated reluctance is a race-neutral reason that can justify a peremptory challenge, even if it would not be sufficient to support a challenge for cause. (*People v. Panah* (2005) 35 Cal.4th 395, 441 [25 Cal.Rptr.3d 672, 107 P.3d 790]; see also *People v. Ledesma* (2006) 39 Cal.4th 641, 678 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1202–1203 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

Defendant next claims a comparative juror analysis reveals the prosecutor's "neutrality" rationale was a pretextual basis for excluding African-American panelists. He notes that Juror No. 9, who was Mexican-American, and Juror No. 11, who was Caucasian, also checked the questionnaire response stating

that they were philosophically neutral on the death penalty. However, when asked to describe their opinions, both of these jurors expressed more favorable views toward capital punishment. Juror No. 9 said she felt the death penalty "is needed to fit certain crimes." Juror No. 11 said he had not given the death penalty much thought, "except the laws [seem] to favor the person before he/she is put to death." These jurors could also be considered prosecution oriented for other reasons. Juror No. 9 worked as a fingerprint analyst for the sheriff's department and was married to a police officer. Juror No. 11 was 41 years old and had been married for 22 years. Before moving to Los Angeles, he was very active in community organizations in his Iowa hometown. He fit the profile of the mature, stable juror the prosecutor said he was seeking.

 Defendant also questions the validity of the neutrality rationale because, during voir dire, the prosecutor asked only one of the excused panelists (Jonathan S.) about his views on the death penalty. A failure to engage in meaningful voir dire on a subject of purported concern can, in some circumstances, be circumstantial evidence suggesting the stated concern is pretextual. (See *Miller-El v. Dretke, supra,* 545 U.S. at pp. 244–245; *People v. Lewis* (2008) 43 Cal.4th 415, 476 [75 Cal.Rptr.3d 588, 181 P.3d 947]; *People v. Huggins* (2006) 38 Cal.4th 175, 234–235 [41 Cal.Rptr.3d 593, 131 P.3d 995].) Defendant's assertion here, however, is misleading. The attorneys were not permitted to question prospective jurors directly, but instead had to ask the trial court to inquire into areas of special concern. With the exception of Prospective Juror Jonathan S., the prosecutor expressed multiple concerns about the panelists he excused, and substantial evidence in the record supports the trial court's conclusion that these race-neutral justifications were genuine. (See *People v. Lewis,* at pp. 476–478.)

*Prospective Juror Gloria Y.*

 Prospective Juror Gloria Y. said she was "neither for nor against the death penalty." The prosecutor was skeptical of this professed neutrality and explained he was trying to exclude as many panelists as possible who expressed that position. In addition, Gloria Y. disclosed that two years ago her nephew was convicted of murder in Chicago, Illinois, and he was still in prison for the offense. She did not know if her nephew had been treated fairly by the police and the court system. The arrest of a juror or a close relative is an accepted race-neutral reason for exclusion. (*Wheeler, supra,* 22 Cal.3d at p. 277, fn. 18; see *People v. Panah, supra,* 35 Cal.4th at p. 442.)

Defendant offers a comparative juror analysis in an effort to show that this asserted reason was pretextual. He notes that Juror No. 8's son was a gang member who had been convicted of burglary, and Juror No. 12's cousin had

been convicted of aggravated assault. We are not persuaded. Neither of these crimes is as serious as murder, the offense committed by Gloria Y.'s nephew and charged against defendant. More importantly, despite the criminal convictions of their relatives, these seated jurors expressed strongly prosecution-oriented views. Juror No. 8, who was of Puerto Rican descent, expressed contempt for violence and gangs and described negative encounters with gang members. Unlike Gloria Y., he strongly favored the death penalty. Juror No. 12, who was Hispanic, also expressed strong support for the death penalty. She had taken courses at the police reserve academy, had applied to work with various law enforcement agencies, and planned to pursue a bachelor's degree in criminal justice. Juror No. 12 also had several friends and relatives who worked in law enforcement, including an uncle who worked as a detective in Long Beach. She wanted to become a police officer herself. Indeed, defendant unsuccessfully challenged this juror for cause based on her law enforcement connections and aspirations. Thus, although they each had a family member who was convicted of a crime, Jurors Nos. 8 and 12 and Prospective Juror Gloria Y. were not similarly situated.

 The prosecutor had another legitimate reason for excusing Prospective Juror Gloria Y. Ms. Y. said she was dissatisfied with the outcome of two criminal cases in which her family members were victims. Her father was murdered in a 1976 armed robbery, and one of her nephews was murdered just a month earlier, in Long Beach, California. No one had been charged in either case. Although she disavowed the response in oral questioning, Gloria Y. said in her questionnaire that, given her feelings about these crimes, she was unsure whether she could be an impartial juror in a case involving violence. This record amply supports the panelist's exclusion. A juror's negative experience with the criminal justice system has long been considered a valid basis for exercising a peremptory challenge. (*People v. Turner* (1994) 8 Cal.4th 137, 171 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

*Prospective Juror Robbie W.*

 Robbie W., a 24-year-old clerk with the State Department of Social Services, had some paralegal training. She gave several curious questionnaire responses that revealed possible misunderstandings of the law. For example, when asked whether she could base a verdict solely on the evidence and instructions presented at trial, Robbie W. stated: "The preponderance of evidence during the phases of discovery etc. will either clear him to be guilty or innocent." She said she was neutral on the death penalty and explained her philosophy as follows: "The death penalty should be imposed if the pre[s]iding judge/jury finds him/her guilty without a reasonable doubt. I am pro-choice in this aspect." Prospective Juror Robbie W.'s father had recently been convicted of driving under the influence of alcohol and had past encounters

with the police stemming from domestic violence against Robbie W.'s mother. The prosecutor said he excused Robbie W. because, in addition to her professed neutrality on the death penalty, she was very young and "came into court wearing a T-shirt and somewhat sloppily attired." Nothing in the record contradicts this description. The prosecutor explained that he generally preferred to have "older, more conservative people" on the jury. A potential juror's youth and apparent immaturity are race-neutral reasons that can support a peremptory challenge. (*People v. Sims* (1993) 5 Cal.4th 405, 430 [20 Cal.Rptr.2d 537, 853 P.2d 992].) As the Supreme Court observed in *Rice v. Collins* (2006) 546 U.S. 333, 341 [163 L.Ed.2d 824, 126 S.Ct. 969], it is not unreasonable for a prosecutor to believe a young person with few ties to the community might be less willing than an older, more permanent resident to impose a substantial penalty. Likewise, a slovenly appearance can reveal characteristics that are legitimately undesirable to the prosecution. (*People v. Hamilton* (2009) 45 Cal.4th 863, 904–905 [89 Cal.Rptr.3d 286, 200 P.3d 898].)

Defendant challenges the credibility of these reasons because the prosecutor did not excuse 28-year-old Juror No. 12. However, as we explained in regard to Prospective Juror Gloria Y., Juror No. 12 was a strongly prosecution-oriented juror. (See, *ante*, at p. 574.) She came from a family of law enforcement officers, aspired to become a police officer herself, and strongly favored the death penalty. Other than their relative youth, Juror No. 12 and Prospective Juror Robbie W. shared little in common. Defendant's comparison does not undermine the trial court's finding that Robbie W. was dismissed for reasons unrelated to her race. That finding is supported by substantial evidence.

*Prospective Juror Ricky W.*

Ricky W. was not a member of the original panel, and the prosecutor challenged him almost as soon as he was called forward. Mr. W. was another prospective juror who expressed neutrality on the death penalty, stating only that he might be in favor of it depending on the case. The prosecutor had several additional reasons for excusing this panelist, however. Foremost among these was Ricky W.'s conviction for receiving stolen property. Although he remained eligible to serve because the crime was a misdemeanor, the criminal conviction was a valid, race-neutral reason for the prosecutor to dismiss him from the jury. (*People v. Sanders* (1990) 51 Cal.3d 471, 500–501 [273 Cal.Rptr. 537, 797 P.2d 561].) Ricky W. described several other encounters with crime and law enforcement that made him an undesirable juror from the prosecution's perspective. He had "a lot of friends" who had been arrested and convicted of crimes, and he had witnessed many crimes, including robberies, drug offenses, thefts and assaults. Ricky W. was robbed

but did not report the crime. The record amply supports the trial court's finding that this panelist was dismissed for legitimate reasons.

*Prospective Juror Darnell F.*

 The prosecutor said he had "mixed feelings" about Prospective Juror Darnell F., and this ambivalence is reflected in the fact that the prosecutor accepted the jury panel five times while it included Mr. F. Acceptance of a panel containing African-American prospective jurors "strongly suggests that race was not a motive" in the challenge of an African-American panelist. (*People v. Lenix, supra,* 44 Cal.4th at p. 629; see also *People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452].) Ultimately, the prosecutor decided to excuse Darnell F. because he had testified as an alibi witness for his brother in a criminal trial for assault. At the prosecutor's urging, the court questioned the panelist about this experience and the nature of his testimony. He initially said he did not know the result of the trial, even though he and his brother were "very close," but he later disclosed that his brother had been convicted and jailed for the offense. Mr. F. had testified that his brother was not at the scene of the crime when it was committed. Because the case resulted in a conviction, the jury apparently rejected Mr. F.'s alibi testimony, and the prosecutor explained that he feared Prospective Juror Darnell F. may have perjured himself on behalf of his brother. Defendant protests that this rationale "smacked of racism" but fails to explain why. We do not agree that this legitimate concern can be blithely dismissed by labeling it "racist." Either the entire jury was wrong when it disbelieved Mr. F.'s alibi testimony and found the brother guilty, or Mr. F. perjured himself when he gave the testimony. This prospective juror's veracity is also called into question by the disclosure that he had been court-martialed and discharged from the Navy for falsifying a reading on his watch station. Mr. F. was also less than candid when he initially told the court that he did not know the outcome of his brother's trial but later admitted to the contrary. Substantial evidence supports the conclusion that the challenge to Darnell F. was not race motivated.

*Prospective Juror Jonathan S.*

The prosecutor accepted the jury once after Jonathan S. joined the panel but later used his 14th peremptory challenge to excuse him. In his question-naire, Jonathan S. had expressed complete neutrality on the death penalty. He described his opinion as "sometimes 'yes' and sometimes 'no.' It depends on the nature of the crime." During voir dire, the prosecutor asked the court to inquire further on this topic. Asked if he had his own criteria about the type of crime warranting the death penalty, Prospective Juror Jonathan S. explained he was trying to say that he was neutral, with no opinion one way or

the other: "It depends on the circumstances how I would go." In responding to defendant's *Wheeler* motion, made immediately after the challenge to Mr. S., the prosecutor explained that his greatest concern was finding jurors who strongly favored the death penalty. He noted, "even if you get people who express philosophical positions supporting the death penalty . . . once put in that position of actually making that decision it's something that's very difficult to do." The prosecutor thought Mr. S. "may or may not be okay," but he was not an ideal prosecution juror because of his neutral opinion of the death penalty. The prosecutor explained, "It's simply a matter of looking down the road with the number of peremptory challenges that I have and some of the people that I know are coming up now [and] deciding that I can do better than that." Considering that the prosecutor specifically questioned Prospective Juror Jonathan S. on his death penalty views and also accepted the jury panel once when it included Mr. S., substantial evidence demonstrates that this challenge was not impermissibly race motivated. As we noted in *People v. Lenix, supra,* 44 Cal.4th at page 623, "the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empanelled." Although the prosecutor might have initially been willing to accept some panelists with neutral opinions on capital punishment, the changing mix of prospective jurors could legitimately motivate him to strike these neutral panelists in hopes of obtaining upcoming jurors with more favorable death penalty views. The prosecutor's explanation that his jury choices were partially influenced by "looking down the road" is also supported by his responses to panelists later called.

*Prospective Juror Stephanie M.-H.*

In responding to defendant's *Wheeler* motion, the prosecutor disclosed that he planned to challenge another African-American prospective juror who was set to be called into the jury box soon. Like Robbie W., Stephanie M.-H. was young. She expressed neutrality on the death penalty in her questionnaire but, when asked to describe her opinion, stated, "Why some are put to death and some aren't for somewhat sim[i]lar crimes." At the prosecutor's request, the court asked her to explain this response, but Prospective Juror Stephanie M.-H. essentially repeated that she did not understand why people could receive different sentences for the same crime. This comment suggested to the prosecutor that Ms. M.-H. might have "some deeper philosophical reservations about the death penalty" than she had revealed in court. The prosecutor had also asked the court to inquire further into other questionnaire responses, and he remained troubled by the prospective juror's responses. Her ex-boyfriend had been prosecuted for purse snatching. She and others in her home owned guns "for protection," and she had fired a gun or been present when guns were

fired as part of a "New Year's tradition." Defendant has not shown that the reasons for excusing Prospective Juror Stephanie M.-H. were pretexts for racial discrimination.

## II. *Guilt Phase Issues*

### A. *Cross-examination of Toler*

Defendant asserts the court unreasonably restricted his cross-examination of Angela Toler, depriving him of his rights to confrontation, due process and a reliable death verdict.

Near the beginning of his opening statement, defense counsel mentioned Somphop Jardensiri, the second clerk working at the market. The prosecutor immediately objected to any discussion of Jardensiri, who would not be testifying. The court sustained the objection. Later in his opening statement, defense counsel asserted the evidence would show Toler identified defendant as the shooter because she was trying to protect a third party. Counsel depicted her interview with the police as follows: "She knows who it is, but she's got [defendant] sitting in the back seat near this weapon and she's being told you're facing the death penalty. You're facing life without. At a minimum you are facing 25 to life. And we have an I.D. on you. The clerk in the store has identified you. The clerk in the store said you shot at him. The clerk in the store said you demanded the money. The clerk in the store said—[objection interposed]—you shot Mr. Nasser Akbar." At a bench conference, the prosecutor explained his objection: "[U]nless [defense counsel] has some knowledge about what the officers told [Toler] that I don't, all there is is they confronted her with the fact she had been identified. She then changed her position. What counsel did, despite the court's ruling, is go in and quote everything that he could from Mr. Jardensiri.[15] There's no indication anywhere in the record that any of that was told by the detectives to Ms. Toler." He argued defense counsel was trying to introduce hearsay statements of Jardensiri.

After confirming there was evidence that a detective told Toler she had been identified, the court asked whether the detective said she had been identified *by the clerk.* Defense counsel candidly acknowledged he did not know. He suspected that such a statement had been made to Toler because a lengthy part of the police interview was not recorded. However, in response to direct questioning from the court, defense counsel acknowledged there was no report reflecting that detectives told Toler she had been identified by

---

[15] It is unclear whether the prosecutor was referring to statements by Jardensiri captured in a police report. We have found no such report in the appellate record.

Jardensiri, or by Akbar for that matter,[16] or identified as the shooter. Defense counsel never offered a good faith basis for his assertions about what the evidence would show. The court sustained the objection and found defense counsel's statements to be in contempt of the court's prior order.

The prosecution called Angela Toler as its first witness. During direct examination, she was asked whether, at some point during her interview, the police told her she had been identified as a participant in the robbery murder. She confirmed that they had. Later in the interview, she decided to tell them the truth. Toler denied that the police made any promises or threats to induce her cooperation. On cross-examination, Toler described what the detectives said during the interview. Defense counsel then asked, "They never told you you were identified as someone who had shot the victim?" Before the prosecutor could object, Toler responded, "No." The court then called for a break to confer with counsel.

Defense counsel gave an offer of proof as to what Jardensiri would have testified if he had been present: "Mr. Jardensiri told the police that he came out from the back room, that he saw Ms. Toler with a gun. That he saw a male Black leaning on the counter, did not see a gun in his hand. That Ms. Toler shot a bullet at him, striking the camera, I believe, and that he took cover and heard Ms. Toler demand money from the victim and followed directly by shots fired. And he went out to view Ms. Toler and said that is the person that shot at me and shot Nasser." The court prohibited defense counsel from repeating any of these statements in his questioning of witnesses "until Jardensiri is on the stand and gives them."

The court initially based its ruling on the hearsay doctrine. Defense counsel then explained he was not offering Jardensiri's statements for truth, but to show their effect on Toler's state of mind. Specifically, he wanted to show that Toler changed her story and implicated defendant after the police told her she had been identified as the shooter. The court responded that counsel was permitted to pose only those "questions which you believe in good faith she may answer. You may not put questions to her which are purely speculative and which are trying to put before the jury matters which you know do not properly go to the jury through this witness."

Defendant was allowed to pursue his theory that Toler changed her story based on what she was told. The available evidence, however, undermined his strategy. On further cross-examination, Toler testified that the police "never mentioned any evidence that they might [have] had against [her]." They did, however, say that she could be sent to prison for life or receive the death

---

[16] Akbar was still alive when defendant and Toler ran from the store.

penalty for her involvement in the robbery murder. Later, Detective Wren testified that when he interrogated Toler, he told her he did not believe her story and eventually told her "she had been identified." Detective Wren was not asked about the source of this identification or whether Toler had been identified as the shooter.

Defendant argues the trial court erred in curtailing his cross-examination of Toler, thus violating his constitutional rights. To the contrary, the trial court properly prevented counsel from asking questions that lacked a good faith basis and invited jury speculation on claims that would not be given any evidentiary support.

The court below did not abuse its discretion in limiting defendant's cross-examination of Toler. Counsel conceded he had *no evidence* that the detectives who interviewed Toler told her that she had been identified by Jardensiri, or identified as the shooter, or anything else of substance from Jardensiri's statement to the police. The evidence in the reports and tape recording of the interview established only that they told her she had been identified as a participant in the crime. Defense counsel's suspicion that the detectives may have told her more, to frighten her into cooperating, was pure speculation. He conceded his belief was based on nothing more than the officers' failure to record part of the interview. Further, Toler confirmed that this belief was false when she testified, in response to the question that drew the prosecutor's objection, that the police never told her she had been identified as the person who shot Akbar. Toler's answer was not stricken, nor was the jury admonished to disregard it. Detective Wren's testimony was consistent with Toler's on this point.

Jardensiri left the country shortly after Akbar's murder, and the prosecution had no way to cross-examine him about statements he made to the police. Nevertheless, defense counsel sought to put these hearsay statements before the jury based entirely on his speculation, contrary to the testimony, that they may have been repeated to Toler and caused her decision to implicate defendant. Such questioning lacked a good faith basis, invited unsupported speculation, and exposed the jury to inadmissible hearsay. The court's rulings were proper.

### B. *Request to Recall Detective Collette*

In a related argument, defendant claims the court violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights by denying his request to recall Detective Collette to cross-examine him about Jardensiri's statements implicating Angela Toler as the shooter.

On direct examination, Detective Collette testified he did not recall mentioning the death penalty or discussing it in a threatening manner in his

interview of Toler. He observed that, based on the information he had at the time, he did not believe Toler was the shooter. Therefore, Detective Collette believed the death penalty would not have been applicable to Toler and did not mention it to her. Defendant did not cross-examine on this point. After asking Detective Collette a single question, defense counsel decided to forgo cross-examining Collette, seeking instead to obtain the information he wished to present from Detective Wren. The next day, however, defense counsel asked the court to recall Detective Collette. Counsel now wanted to impeach Collette's statement that he did not believe Toler was the shooter, and thus not death eligible. Counsel believed the detectives had evidence from Jardensiri identifying Toler as the shooter. The court observed it had seen nothing demonstrating that Detective Collette actually had such evidence. The court declined defendant's request to return to this point. Defendant did not seek to recall Collette for any other purpose.

For the same reasons discussed in the preceding part, the trial court did not abuse its discretion. Defendant had ample legitimate opportunity to cross-examine Detective Wren and Toler on this issue.

### C. Clothing Evidence

Defendant complains the court erroneously admitted a black jacket and ski mask found in the trunk of the car defendant had been riding in when arrested. Long Beach Police Officer John Bruce testified about his inventory search of the trunk. Among other items, he found a plastic grocery bag containing an extra-large black corduroy jacket with an "F" on the chest and a black ski mask. Defendant objected that this evidence lacked probative value because no witness had stated that a black jacket or ski mask was worn during the robbery of the P & B Market, and the mask could be prejudicial to defendant. The court denied defendant's motion to exclude the clothing evidence. On appeal, defendant renews his claim that this evidence was irrelevant and prejudicial, and he asserts for the first time that admission of the evidence deprived him of a fair trial in violation of the due process clause.

A trial court has broad discretion to determine whether evidence is relevant. (*People v. Scheid* (1997) 16 Cal.4th 1, 14 [65 Cal.Rptr.2d 348, 939 P.2d 748].) Evidence is relevant if it has some "tendency in reason to prove or disprove" a disputed material fact. (Evid. Code, § 210.) Although witnesses did not mention a black jacket or ski mask, these items were relevant circumstantial evidence in the prosecution's case against defendant. The evidence showed that the robbery was not a spur-of-the-moment undertaking but instead resulted from a decisive course of conduct: Toler testified that defendant asked her to "hook him up with a lick," or show him a place to

rob. They left together in a rented Ford Taurus. They initially selected another business as their target but abandoned it as unsuitable because it was too crowded. They then drove to the P & B Market, committed the crimes, split the proceeds, picked up Sullivan, and drove around in the getaway car. That defendant was arrested within an hour or so of the murder, with Toler and Sullivan, in a rented Ford Taurus that also contained two handguns and common robbery attire is relevant in itself. It is also corroborative of Toler's testimony.

Defendant also contends the clothing evidence was inflammatory because it encouraged the jury to infer defendant had used it in some *other* robbery, and thus that he had a propensity to commit crimes. (See Evid. Code, § 1101, subd. (b).) No propensity argument was made to the jury, and defendant did not raise this objection below. In any event, the risk of jurors drawing an impermissible propensity inference from two items of clothing was slight, and defense counsel took pains to deflate any such inference in his closing argument. Defense counsel also used the clothing evidence to his advantage to support a theory that the shooter was Toler or Sullivan, either of whom could have been mistaken for a man while wearing the large black jacket.

The trial court did not abuse its discretion in admitting the evidence of the jacket and ski mask.

### III. *Penalty Phase Issues*

#### A. *Discharge of Juror During Deliberations*

Defendant claims the court improperly dismissed a juror during penalty phase deliberations, depriving him of his constitutional rights to due process, a trial by jury, and freedom from cruel and unusual punishment. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, § 16.) He also argues the court abused its discretion in questioning the jurors about the challenged juror's misconduct. Defendant contends these errors require reversal of his death sentence.

The trial court conducted a lengthy inquiry and gave detailed reasons for discharging the juror in question, Juror No. 5. This record reflects a demonstrable reality (see *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 [63 Cal.Rptr.3d 82, 162 P.3d 596]) that Juror No. 5 was unable to perform his duty as a capital juror because he was conscientiously opposed to the death penalty and was refusing to deliberate with his fellow jurors. Accordingly, the trial court did not abuse its discretion in discharging Juror No. 5 and denying defendant's motion for a mistrial.

1. *Relevant Proceedings*

On the second day of its deliberations, the jury sent out the following note: "It has come to our attention that one juror has reevaluated his/her personal feelings regarding application of the death penalty. His/her consciencious [*sic*] objection causes him/her to be unable to continue to deliberate." The defense urged the court to make no inquiries and order the jury to continue deliberating. Nevertheless, relying on *People v. Ray* (1996) 13 Cal.4th 313 [52 Cal.Rptr.2d 296, 914 P.2d 846] and *People v. Castorena* (1996) 47 Cal.App.4th 1051 [55 Cal.Rptr.2d 151], the trial court concluded a hearing was necessary to determine whether the juror was unqualified to sit due to bias or was failing to deliberate properly.

After identifying the juror described in the note, the court questioned Juror No. 5 apart from the rest of the jury. When asked if he had a conscientious objection to the death penalty that would prevent him from imposing it "no matter what evidence or information" he received, Juror No. 5 answered "no," that was not his position. Asked if he could conceive of a situation in which he would vote for the death penalty, Juror No. 5 responded "yes" and added, "in this particular case, I thought there was a choice of death or life without the possibility of parole." He said, "I tried to make an evaluation from the evidence that was presented and that is what I came up with[,] the life position without the possibility of parole."

The court excused Juror No. 5 and called the foreperson (Juror No. 2) into the courtroom. When the court asked what aspects of Juror No. 5's conduct led the jury "to say he was not deliberating as opposed to that he is disagreeing with others," the foreperson responded: "We had extensive conversations about his reasoning behind his decision, and everyone in the room gave extensive reasons for their decision, and his decision was not backed up by anything. It was more of a feeling that he said he had in spite of all evidence and facts that were presented. [¶] When asked why he felt the way he did, he basically said that he just did, and that he wasn't sharing his reasoning or his feelings with us to any degree. It was just a hard and fast decision. [¶] We tried asking him why, what would make him consider an alternative to his decision, and he couldn't or wouldn't come up with any reasonable foundation for—well, for his decision. He is not cooperating with us. He doesn't feel like he wants to be in that room." After the court cautioned the foreperson not to reveal the content of the jury's deliberations, the juror continued: "We attempted with every means that I can reasonably describe here to get him to communicate with us, and to describe to us how he is evaluating the facts in the case, the law as presented in the instructions, and we basically tried to pin him down, if you will, on his feelings about the death penalty and what it means. [¶] He's basically completely uncooperative

as if he is really the only person in the room. There was no input, just a hard and fast opinion that really was not founded in any manner to us. [¶] We, on many occasions, tried to get him to talk to us and in fact we asked him to state his opinion and to reverse—and reverse to convince us, and he just would basically sit there and do nothing. Just [say], 'I don't know.' "

The foreperson also described the circumstances surrounding creation of the note sent to the court: "The wording that you have in front of you was scripted on the black board and every person had the opportunity to modify, disagree with or in fact agree with what it was, including Juror Number 5[.] [We] asked numerous times does everyone agree with turning this in as discussed. It took us about 10 minutes just to get the scripting." Juror No. 5 "was there of course in the room and asked does this appropriately represent your feelings in this matter and he agreed."

The foreperson continued, "It became quite apparent to me, and I would believe to the other jurors, that Juror Number 5 has a basic underlying philosophical conscientious objection that really probably was not apparent even to him when he was filling out the interview forms based on the lack of foundation of any kind that he would provide to us for his reasoning." The other jurors repeatedly asked Juror No. 5 whether there was any factual situation in which he could vote for the death penalty but "always, without fail, got a totally evasive answer." Even when extreme examples were suggested, Juror No. 5 would not agree that the circumstances warranted imposition of the death penalty. The foreperson said that he asked Juror No. 5 to describe a set of circumstances in which he would consider the death penalty, but Juror No. 5 "could not come up with anything, with any set of circumstances that he would raise his hand and vote for the death penalty." The foreperson stated this had been Juror No. 5's position from the beginning of the penalty phase deliberations.

Defense counsel asked the court to inquire if Juror No. 5 had participated in a discussion about reasonable doubt regarding the aggravating factors. He argued the foreperson's statements established that Juror No. 5 did deliberate but that the other jurors had "tried to browbeat him" into voting for death. The court refused to inquire into the specific content of deliberations. Instead, the court asked the foreperson if he had said Juror No. 5 had deliberated with other jurors at some point, that is, "discuss[ed] the evidence of the penalty phase." The foreperson denied making such a statement. Before he was sent back to the jury room, the foreperson raised another complaint. From the outset of the penalty phase deliberations, Juror No. 5 had "continually attempted to discuss facts not in evidence. He is hunting in areas that we have no understanding or knowledge of, trying to bring things in that really are not there, what-ifs, histories, potential circumstances."

The court proposed to question all of the jurors about the note. Defense counsel agreed with this approach. He asserted Juror No. 5 was being "browbeaten" by the majority jurors and the note should be disregarded. The court disagreed that anything had been presented to suggest coercion. On the contrary, the court stressed, "the conduct and demeanor of the foreman here has been totally nonaccusatory. He has had nothing in his demeanor, his look, his wording, his tone that suggests a fault-finding with Number 5." At defendant's request, the court then questioned each of the jurors individually, apart from the group.

All jurors confirmed that Juror No. 5 had agreed to the wording of the note sent to the court. Juror No. 1 thought Juror No. 5 "seemed a little confused on the wording" at first, but he ultimately agreed with it. All other jurors simply stated that Juror No. 5 agreed with the note.

In questioning Juror No. 1, the court briefly touched on the topic of whether Juror No. 5 was refusing to deliberate. Asked if Juror No. 5 was discussing the evidence and instructions with the others, Juror No. 1 answered, "Yes, he is. A little bit he is," but Juror No. 5 seemed "confused" about the instructions requiring him to base opinions on the law and evidence. Concerned that this line of questioning risked intruding on the substance of the jury's deliberations, the court did not pursue it with other jurors. Juror No. 10 volunteered, however, that Juror No. 5 "couldn't deliberate because he conscientiously was opposed to the death penalty."

*All* of the jurors told the court that Juror No. 5 had a conscientious objection to imposing the death penalty. Juror No. 3 believed Juror No. 5 had a conscientious objection because "it would be the same thing no matter what." The other jurors had asked Juror No. 5 to describe a set of facts in which he would be prepared to impose the death penalty, and he did not do it. Nor would he agree to the death penalty when presented with extreme hypotheticals by the other jurors. Juror No. 3 explained, "I think he is really a truly conscientious objector. I don't think the situation—I don't think that it would make any difference." Juror No. 6 recalled that Juror No. 5 said, " 'I cannot in all conscience vote for the death penalty.' " The court asked whether Juror No. 5 had an objection to the death penalty itself, "across the board," or whether his objection was simply a disagreement with application of the death penalty in this case. Juror No. 6 replied, "It seems to me that he is expressing this to the death penalty. He does not approve of the death penalty." The jurors asked Juror No. 5 if there was any case in which he could impose the death penalty, and, according to one juror, "the only thing that he said was perhaps the murder of a child would be the only thing he could vote for the death penalty vote [*sic*]." Like Juror No. 6, Juror No. 7 recalled that Juror No. 5 stated he could not "conscientiously . . . go along with" the death penalty.

Juror No. 10 said that Juror No. 5 was "conscientiously objecting to the death penalty in this case." However, he explained that "by conscientiously objecting, [Juror No. 5] meant that he could not consider the death penalty regardless of the evidence of the case or the information that we were deliberating on because he conscientiously could not reach that decision." He felt that way "[r]egardless of the evidence, regardless of [the jury's] deliberations." Juror No. 5 told them that, in general, "he believed in the death penalty but he couldn't apply it in this case. [¶] In other words, . . . he said he couldn't consider any of the information we had before us, any of the evidence that has been presented, any of our deliberation for or against the death penalty because he was conscientiously opposed to the death penalty in this case." Juror No. 11, however, understood Juror No. 5's statements about conscientious objection to mean he objected to application of the death penalty "in any case." Juror No. 12 also reported that Juror No. 5 said he had a conscientious objection to the death penalty, and this objection was "in general," as opposed to in this particular case.

The court concluded the other jurors had raised allegations of misconduct. The court summarized the allegations: "What I have in front of me at the moment [are] statements that he is using outside information, that which is not in evidence. He is refusing to discuss and deliberate on the evidence in this case. He has stated that he is a conscientious objector. One person said that he would apply the death penalty only in the case of a child, which again would be juror misconduct to refuse to consider it for the case in which he is sitting where he knew obviously there is no child here. He has said that he will not consider it in this case. And apparently his statement on the questionnaire [identifying himself as 'moderately in favor' of the death penalty] is false." The court called Juror No. 5 back into court to respond to these allegations.

Juror No. 5 admitted stating that he would consider the death penalty if a child had been murdered, but he denied saying that was the only circumstance in which he would consider it. Asked if he agreed to the wording of the note sent to the court, Juror No. 5 responded, "Not entirely because they were kind of leaning on the fact that I was a conscientious objector and I am not." He felt pressured and did not want to fight with the other jurors, so he told them he agreed with the note. When confronted with the discrepancy between his statement in the questionnaire that he was "moderately in favor" of the death penalty and his statement to other jurors that he would only consider the death penalty for the murder of a child, Juror No. 5 responded that the other jurors "were trying to come up with examples of when I would consider it. That was just one of the things that I mentioned, that, you know, I would consider." He said he had been discussing the evidence with other jurors "to the best of my ability," and had verbalized what he thought about the evidence. Juror No. 5 admitted he had discussed factual scenarios not

based on the evidence in this case, but only "after the fact that they basically thought I was going to be dismissed."

After brief argument from counsel, the court stated its ruling: "The record should reflect that Juror No. 5, the first time he came out, could scarcely be heard. He was whispering his responses and his voice has been much stronger in the second time he has come out. [¶] The court's decision . . . is that this is a juror who is failing to deliberate. There is considerable support for the idea that he is actually unqualified and therefore should be dismissed for that reason in that he does have a conscientious objection against the death penalty. There is a slight ambiguity in that; in that one said he would apply it for a child. Everybody else said the opinion that he wouldn't apply it at all. His limiting it to that one situation would be reason to excuse him for cause. [¶] It appears even if he were not to be excused for his conscientious view, that he is failing to deliberate. All 11 agree that he is not using the evidence, that he has given no explanation at all for his views. I am aware of the fact that he does not have to give a dissertation on his views. However, that is not the extreme that is being sought. [¶] The foreman, who certainly is articulate, stated that Juror No. 5 would give no information at all, would not discuss the case or anything about it. [¶] Number 5 agreed with this wording that he has a conscientious objection that makes him unable to deliberate. [¶] My opinion in seeing Juror No. 5 is that he does not like to be confronted with this. I understand his discomfort, but according to all 11 he did agree with this as an accurate statement of his position. I am therefore excusing Juror No. 5 and put[ting] in an alternate."

An alternate was chosen to replace Juror No. 5, and deliberations continued for the remainder of the afternoon. Defendant moved for a mistrial on the ground that jurors had committed misconduct in threatening Juror No. 5 with dismissal from the jury. The motion was denied. When the jury returned on Monday morning, it announced it had reached a verdict.

Before the jury returned to the courtroom, the court further explained its reasons for discharging Juror No. 5: "My decision to remove Juror Number 5 last Friday was a discretionary call and, as such, it will be and should be subject to review. The reviewing court should have as much information as possible on my reasoning and, therefore, I wish to clarify the record. [¶] I started my evaluation with the statement written by the foreman that one juror was conscientiously opposed to the death penalty. Questioning of all twelve jurors clarified that Juror Number 5 approved of that language and knew, of course, that he was the one spoken of. The court was at that time confronted with Mr. L.'s unequivocal statement on the jury questionnaire, given under penalty of perjury, that he had no conscientious objection to the death penalty, and with his later unequivocal admission to the other jurors

that he did, in fact, have conscientious objection to it. At no time in the voir dire process or in last Friday's questioning did Mr. L. express any difficulty in understanding the phrase 'conscientious objection.' His written statement in the questionnaire was thus shown to be perjurious. Such perjury was cause for dismissal. [¶] Further questioning elicited his statement that he could vote for death if a child were the victim of a murder. He knew that there was no issue of a child's murder in this case and so this equivocation does not change the fact that he would automatically refuse to vote for death in every case regardless of what the evidence showed, unless a child were the murder victim."

The court continued: "The entire death qualification part of the voir dire process was aimed at ensuring that no one sat on this jury who would automatically vote for death regardless of the evidence, nor anyone who would automatically refuse to vote for death regardless of the evidence. Mr. L. was clearly in this latter category. To have left Mr. L. on the jury would have made a mockery of the whole process of questioning potential jurors under oath as to their impartiality. [¶] Moreover, the questioning of other jurors revealed that Mr. L. refused to deliberate in the penalty phase by refusing to consider the evidence presented. [¶] The questioning revealed no pressure being put by others on Mr. L. The manner of each juror questioned was calm and pleasant, no anger or impatience was shown, and no lack of respect for Mr. L. was apparent. If Mr. L. felt pressure, that does not establish that others were applying pressure. He could well have felt pressure from his having concealed his true views in voir dire."

The reconstituted jury fixed defendant's penalty at death.

### 2. *Analysis*

 The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is unable to perform his or her duty. (§ 1089.) "When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required. (People v. Burgener[, supra,]* 29 Cal.4th [at p.] 878 . . . ; *People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225].)" (*People v. Barnwell, supra,* 41 Cal.4th at p. 1051.) If the trial court has good cause to doubt a juror's ability to perform his duties, the court's failure to conduct a hearing may constitute an abuse of discretion on review. (*People v. Cleveland,* at p. 478; *People v. Burgener* (1986) 41 Cal.3d 505, 519–520 [224 Cal.Rptr. 112, 714 P.2d 1251].) "Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists. [Citations.]" (*People v. Keenan* (1988) 46 Cal.3d 478, 532 [250 Cal.Rptr. 550, 758 P.2d 1081].)

"A sitting juror's actual bias, which would have supported a challenge for cause, renders him 'unable to perform his duty' and thus subject to discharge and substitution . . . ." (*People v. Keenan, supra,* 46 Cal.3d at p. 532.) Specifically, in the death penalty context, we have explained that "[a] juror may be disqualified for bias, and thus discharged, from a capital case if his views on capital punishment 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt,* [*supra,*] 469 U.S. [at p.] 424 . . . , quoting *Adams v. Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 100 S.Ct. 2521]; see also *Witherspoon v. Illinois* (1968) 391 U.S. 510, 521–522 [20 L.Ed.2d 776, 88 S.Ct. 1770].)" (*People v. Keenan,* at p. 532.)

Bias is often intertwined with a failure or refusal to deliberate. "A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge. [Citations.]" (*People v. Barnwell, supra,* 41 Cal.4th at p. 1051; see also *People v. Engelman* (2002) 28 Cal.4th 436, 442 [121 Cal.Rptr.2d 862, 49 P.3d 209].) "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*People v. Cleveland, supra,* 25 Cal.4th at p. 485.) A refusal to deliberate is misconduct. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1411 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

Although decisions to investigate juror misconduct and to discharge a juror are matters within the trial court's discretion (e.g., *People v. Maury* (2003) 30 Cal.4th 342, 434 [133 Cal.Rptr.2d 561, 68 P.3d 1]), we have concluded "a somewhat stronger showing" than is typical for abuse of discretion review must be made to support such decisions on appeal. (*People v. Wilson* (2008) 44 Cal.4th 758, 821 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) In *People v. Barnwell, supra,* 41 Cal.4th at page 1052, we held that the basis for a juror's disqualification must appear on the record as a "demonstrable reality." This standard involves "a more comprehensive and less deferential review" than simply determining whether any substantial evidence in the record supports the trial court's decision. (*Ibid.*) It must appear "that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established." (*Id.* at pp. 1052–1053.) However, in applying the demonstrable reality test, we do not reweigh the evidence. (*Id.* at p. 1053.)

The inquiry is whether "the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Ibid.*)[17]

The trial court discharged Juror No. 5 based on his bias against capital punishment, his false statements in the jury questionnaire, and his refusal to deliberate in the penalty phase. Each of these findings is supported by ample evidence on which the trial court specifically relied.

Juror No. 5's disqualifying bias against the death penalty was shown to a "demonstrable reality" by the foreperson's note and the testimony of all of Juror No. 5's fellow jurors. Even Juror No. 5 admitted he had agreed to the wording of the note, which explained he had reevaluated his feelings about the death penalty and now had a conscientious objection that prevented him from deliberating further. All of the other jurors testified that Juror No. 5 had made statements indicating he was conscientiously opposed to voting for the death penalty. With a single exception, he could not think of a factual situation in which he would vote for death, nor would he agree that death would be the appropriate punishment when extreme situations were suggested by other jurors.

Juror No. 5 did ultimately deny that he had a disqualifying bias against the death penalty, and defendant focuses on these denials to support an argument that other jurors were attempting to coerce Juror No. 5 into joining them to vote for death. But a juror need not admit a bias for the court to find that it exists. We have observed that trial courts are frequently confronted with conflicting evidence on the question whether a deliberating juror has exhibited a disqualifying bias. (*People v. Barnwell, supra*, 41 Cal.4th at p. 1053.) "Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it." (*Ibid.*) In such circumstances, the trial court must weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings. We defer to factual determinations based on these assessments. (*Ibid.*)

Testimony by many jurors made it clear Juror No. 5's objection to the death penalty was not based on the specific evidence presented in this case, but was rather an objection to imposition of the penalty in any case not

---

[17] In supplemental briefing, defendant urges us to abandon the "demonstrable reality" standard in favor of the test applied in federal courts and courts of other states, which prohibits dismissal of a juror if there is any "reasonable possibility" the dismissal is based on the juror's views of the merits of the case. (E.g., *U.S. v. Brown* (D.C. Cir. 1987) 262 U.S. App.D.C. 183 [823 F.2d 591, 596]; *U.S. v. Thomas* (2d Cir. 1997) 116 F.3d 606, 622; *U.S. v. Symington* (9th Cir. 1999) 195 F.3d 1080, 1088.) We considered and rejected these arguments in *People v. Cleveland, supra*, 25 Cal.4th at pages 480–484. Defendant offers no persuasive reason for us to alter our settled view.

involving a child. All the evidence presented to the court established that Juror No. 5 would never be willing to impose the penalty for the type of case presented here, without a child victim, regardless of the aggravating evidence presented about the defendant and the crime. Juror No. 5 was aware from the beginning that this case involved the murder of an adult store clerk, not the murder of a child; nevertheless, he represented to the parties and the court that he was "moderately in favor" of the death penalty. Juror No. 5's opposition to the death penalty, except perhaps in limited and extreme circumstances not presented here, would have supported a challenge for cause if it had been disclosed in voir dire. His categorical position on the death penalty, regardless of the evidence, reflected an undisclosed bias that rendered him unable to perform his duty as a juror and properly subject to discharge under section 1089. (*People v. Keenan, supra,* 46 Cal.3d at p. 532.)

Defendant's reliance on *People v. Wilson, supra,* 44 Cal.4th 758, is unavailing. In *Wilson,* we concluded the trial court erred in removing a juror at the penalty phase because the record did not show to a demonstrable reality that he was unable to perform his duty. (*Id.* at p. 814.) The situation was quite different in *Wilson.* There, the challenged juror explained that his decision was based on mitigating evidence about the defendant's abusive and dysfunctional family. (*Id.* at pp. 814, 824.) Although the juror appeared to have weighed the mitigating evidence more heavily than did others because of his experience as an African-American father, we concluded his reliance on life experience was appropriate at the penalty phase and did not render him unable to serve. (*Id.* at p. 831.) Here, in contrast, there is no indication Juror No. 5 relied on any evidence whatsoever about this case, or defendant, in making a penalty determination. On the contrary, Juror No. 10 said that Juror No. 5 refused to consider any of the evidence in the case or the jury's deliberations because his conscience prevented him from voting for the death penalty.

The record also establishes to a demonstrable reality that Juror No. 5 had committed misconduct by refusing to deliberate. The foreperson complained at length that Juror No. 5 came into the jury room with a "hard and fast decision" but refused to share any of the reasoning or feelings behind this decision with the other jurors. The foreperson said Juror No. 5 would not communicate with the others and was "basically completely uncooperative as if he is really the only person in the room." Although one juror thought Juror No. 5 had deliberated "a little bit," another told the court Juror No. 5 had said he was not able to consider the evidence or take part in the deliberations because of his conscientious objection to the death penalty.

"The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, ' "does not offend constitutional proscriptions." ' [Citation.]" (*People v. Wilson, supra,* 44 Cal.4th at

pp. 820–821.) Because we have concluded the trial court did not abuse its discretion in excusing Juror No. 5, the discharge of this juror did not violate defendant's constitutional rights.

 Finally, defendant claims the trial court "improperly delved into the jury's deliberative process" when it questioned Juror No. 5, and the other jurors, after receiving the foreperson's note. Because the note said Juror No. 5's opposition to the death penalty made him "unable to *continue* to deliberate" (italics added), defendant argues the court should have made no inquiries but simply ordered the jury to continue deliberating. We disagree. When the trial court was notified that a juror had a disqualifying bias, it had a duty to investigate the allegation. (*People v. Cleveland, supra,* 25 Cal.4th at pp. 476–478; *People v. Keenan, supra,* 46 Cal.3d at pp. 532–533; *People v. Burgener, supra,* 41 Cal.3d at p. 520; see also *People v. Engelman, supra,* 28 Cal.4th at p. 443.) Out of concern to protect the sanctity of jury deliberations, we have cautioned that this inquiry "should be as limited in scope as possible" and "should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*People v. Cleveland,* at p. 485.) "Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*Ibid.*)

The inquiry here was sufficiently restrained. First, the court questioned Juror No. 5 and the foreperson separately about the statements in the note. After hearing from them, the court proposed to ask each of the jurors simply whether everyone had agreed to the wording of the note. Defense counsel supported this proposal, so long as the jurors were questioned individually. The court did so, and reminded the jurors repeatedly not to divulge the substance of their deliberations. At no time did the court permit the attorneys to question the jurors. (See *People v. Cleveland, supra,* 25 Cal.4th at p. 485.) The record reflects that the court admonished jurors to avoid inappropriate topics and intervened if their answers threatened to go too far afield. No error appears in these proceedings.

### B. *Cumulative Error*

Defendant argues the cumulative effect of guilt and penalty phase errors requires reversal of his death sentence. Because defendant has not established that any prejudicial error occurred at either phase of his trial, this claim fails. (See *People v. Butler* (2009) 46 Cal.4th 847, 885 [95 Cal.Rptr.3d 376, 209 P.3d 596].)

## C. *Challenges to Section 190.3 Sentencing Factors*

Defendant raises several constitutional arguments challenging the standard instructions about the section 190.3 sentencing factors and the application of these factors. We have rejected each of these challenges in the past and now reaffirm our holdings.

Allowing a jury to find aggravation based on the circumstances of the crime under section 190.3, factor (a), does not result in an arbitrary and capricious imposition of the death penalty. (*People v. Williams* (2008) 43 Cal.4th 584, 648 [75 Cal.Rptr.3d 691, 181 P.3d 1035]; *People v. Cook* (2007) 40 Cal.4th 1334, 1366 [58 Cal.Rptr.3d 340, 157 P.3d 950]; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 114 S.Ct. 2630] ["The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence."].)

The admission of evidence about a defendant's unadjudicated criminal activity under section 190.3, factor (b), does not in itself offend the state or federal Constitution. (*People v. Maury, supra*, 30 Cal.4th at p. 439.) The lack of a unanimity requirement for jury findings on these unadjudicated criminal acts does not allow the jury to impose a death verdict based on undeliberated factual findings or otherwise deprive a capital defendant of his Sixth Amendment right to a jury trial (*People v. Williams, supra*, 43 Cal.4th at pp. 648–649; *People v. Stanley* (2006) 39 Cal.4th 913, 963 [47 Cal.Rptr.3d 420, 140 P.3d 736]), and the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] do not alter these conclusions. (*People v. Burney* (2009) 47 Cal.4th 203, 259–260 [97 Cal.Rptr.3d 348, 212 P.3d 639]; *People v. Prieto* (2003) 30 Cal.4th 226, 263 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

The trial court's failure to delete inapplicable sentencing factors from CALJIC No. 8.85 did not deprive defendant of an individualized sentencing determination or artificially inflate the weight of aggravating factors. (*People v. Cook, supra*, 40 Cal.4th at p. 1366; *People v. Yeoman* (2003) 31 Cal.4th 93, 164–165 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Nor did use of the words "extreme" and "substantial" in section 190.3, factors (d) and (g), impermissibly limit the jury's consideration of mitigating factors in violation of the federal Constitution. (*People v. Maury, supra*, 30 Cal.4th at p. 439; *People v. Williams* (1997) 16 Cal.4th 153, 276 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Further, the trial court had no duty to instruct the jury that certain sentencing factors (§ 190.3, factors (d)–(h) & (j)) can only mitigate, and not aggravate, the crime. (*People v. Leonard, supra*, 40 Cal.4th at p. 1430;

*People v. Farnam* (2002) 28 Cal.4th 107, 191 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Nothing in the federal Constitution required the jury to make written findings on the aggravating factors supporting its death verdict. (*People v. Williams, supra,* 43 Cal.4th at p. 648; *People v. Maury, supra,* 30 Cal.4th at p. 440; *People v. Frierson* (1979) 25 Cal.3d 142, 178–180 [158 Cal.Rptr. 281, 599 P.2d 587].) Defendant also claims that, even if the absence of certain procedural protections does not render the state's death penalty procedures unconstitutional, the availability of some of these protections to noncapital defendants denies equal protection to those facing the death penalty. We have rejected this argument in the past (e.g., *People v. Cook, supra,* 40 Cal.4th at p. 1367; *People v. Blair* (2005) 36 Cal.4th 686, 754 [31 Cal.Rptr.3d 485, 115 P.3d 1145]) and continue to do so.

### D. *Constitutionality of Death Penalty Statute and Instructions*

Defendant also presents several familiar challenges to California's death penalty statute and instructions but offers no persuasive justification for us to reconsider settled law rejecting these claims.

Neither the federal nor the state Constitution requires that the jury apply a beyond a reasonable doubt standard in determining whether aggravating factors are true, whether circumstances in aggravation outweigh those in mitigation, or whether death is the appropriate penalty. (*People v. Leonard, supra,* 40 Cal.4th at p. 1429; *People v. Manriquez* (2005) 37 Cal.4th 547, 589 [36 Cal.Rptr.3d 340, 123 P.3d 614].) These conclusions have not been altered by the Supreme Court's decisions in *Apprendi v. New Jersey, supra,* 530 U.S. 466 and *Ring v. Arizona, supra,* 536 U.S. 584. (*People v. Williams, supra,* 43 Cal.4th at p. 649; *People v. Prieto, supra,* 30 Cal.4th at p. 275.) Because the determination of whether to apply the death penalty is essentially a normative decision, we have held the prosecution bears no burden of persuasion in the penalty phase. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1136–1137 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Hayes, supra,* 52 Cal.3d at p. 643.) Further, neither the federal Constitution nor the high court's decisions in *Apprendi* and *Ring* require that jurors reach a unanimous decision on aggravating factors. (*People v. Manriquez, supra,* 37 Cal.4th at p. 590; *People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

Defendant also argues his Sixth, Eighth, and Fourteenth Amendment rights were violated because the jury instructions failed to state that mitigating factors need not be found unanimously or by any particular standard of proof. We have recently rejected this claim (*People v. Ervine* (2009) 47 Cal.4th 745, 810 [102 Cal.Rptr.3d 786, 220 P.3d 820]; *People v. Rogers* (2006) 39 Cal.4th 826, 897 [48 Cal.Rptr.3d 1, 141 P.3d 135]) and continue to do so. Nor were

the pattern instructions constitutionally deficient for failing to state that there is a " 'presumption of life' " at the penalty phase analogous to the presumption of innocence in the guilt phase. (*People v. McWhorter* (2009) 47 Cal.4th 318, 379 [97 Cal.Rptr.3d 412, 212 P.3d 692]; see *People v. Lewis* (2009) 46 Cal.4th 1255, 1318 [96 Cal.Rptr.3d 512, 210 P.3d 1119].)

Defendant raises several challenges to CALJIC No. 8.88, the standard penalty phase concluding instruction.[18] (See *People v. Moon* (2005) 37 Cal.4th 1, 42 [32 Cal.Rptr.3d 894, 117 P.3d 591].) We have rejected all of these claims in the past, and defendant does not persuade us to reconsider our view that the instruction is constitutional. In CALJIC No. 8.88's statement that jurors "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole" (CALJIC No. 8.88), the phrase "so substantial" is not impermissibly vague (*People v. Moon*, at p. 43; *People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585]), and the term "warrants" is not overbroad. (*People v. Griffin* (2004) 33 Cal.4th 536, 593 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Medina* (1995) 11 Cal.4th 694, 781 [47 Cal.Rptr.2d 165, 906 P.2d 2].) CALJIC No. 8.88 is not unconstitutional for failing to tell the jury that it must impose a sentence of life without the possibility of parole if it finds that circumstances in mitigation outweigh those in aggravation. (*People v. Moon*, at p. 42; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Nor is the instruction defective for failing to tell the jury it could impose a life sentence even if aggravating factors outweighed mitigating factors. We have repeatedly held a defendant is not entitled to such an instruction. (*People v. Coffman and Marlow*, at p. 124; *People v. Medina*, at p. 782; *People v. Beeler* (1995) 9 Cal.4th 953, 997 [39 Cal.Rptr.2d 607, 891 P.2d 153].) CALJIC No. 8.88 is not unconstitutional for failing to state that a defendant bears no burden of proving the inappropriateness of the death penalty. (*People v. Moon*, at pp. 43–44; *People v. Medina*, at p. 782.)

Finally, we have repeatedly held that the death penalty does not violate the Eighth Amendment to the United States Constitution or international law, including article VII of the International Covenant on Civil and Political Rights (Dec. 16, 1966). (*People v. Butler, supra*, 46 Cal.4th at p. 885; *People v. Cook, supra*, 40 Cal.4th at p. 1368.) We also adhere to our conclusion that review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 42, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Williams, supra*, 43 Cal.4th at p. 649; *People v. Harris* (2008) 43 Cal.4th 1269, 1322–1323 [78 Cal.Rptr.3d 295, 185 P.3d 727].)

---

[18] Language similar to CALJIC No. 8.88 now appears in CALCRIM No. 763.

## DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 11, 2010. George, C. J., did not participate therein.